## BURRIS v. AMERICAN CHICLE CO. et al.
### Civ. No. 434.

District Court, E. D. New York.
May 24, 1940.

Alexander Loeb, of New York City (Callaghan, Stout & Nova, of New York City, of counsel), for plaintiff.

Herbert F. Hastings, Jr., of New York City (Arthur K. Wing and James G. Purdy, both of New York City, of counsel), for defendant and third party plaintiff American Chicle Co.

Aaron William Levy, of New York City (Beryl Levy, of New York City, of counsel), for third party defendant.

CAMPBELL, District Judge.

These are two motions to set aside the verdicts rendered by the Jury (1) in favor of the plaintiff against the defendant, (2) in favor of the third party plaintiff against the third party defendant.

The long delay in this matter is due to the fact that the briefs did not come to me until May 8, 1940.

The facts are substantially the same, but there are differences in some of the questions of law presented on each of the said motions.

The above entitled action was tried before me with a Jury and after a trial occupying twelve days a verdict was rendered in favor of the plaintiff against the defendant for $35,000, and a verdict was likewise rendered in favor of the third party plaintiff against the third party defendant for the same amount.

Both defendants joined in motion (1) to set aside the verdict and to dismiss the complaint, or direct a verdict for the defendants, or for a new trial.

Motion (2) was made by the third party defendant on the ground that it is contrary to law.

Decision on said motions was reserved by me and permission was granted to counsel for all parties to submit briefs in support of their respective contentions.

The plaintiff was a window cleaner employed by the third party defendant and engaged in the cleaning of windows on a building owned by the defendant, which was a public building, as defined by the Labor Law, and while so engaged was injured by the fall of the scaffold, on which he and another man were working, due to the parting of a rope, which supported the end of the scaffold on which the plaintiff was working.

The cleaning of the windows in the defendant's building was being done by the third party defendant, its agents or servants, the plaintiff being its leading workman or foreman, under a contract with the defendant and third party plaintiff.

The plaintiff was acting under the orders of the third party defendant which furnished the scaffold and rope in question.

Plaintiff contends that the accident was caused solely by reason of the unsafe condition of the rope on the swinging scaffold, which parted, and which was neither made, nor purchased, by the defendant, but was furnished by the third party defendant for the performance of the contract, it had made for the cleaning of the windows of the defendant's building.

Recovery is sought by the plaintiff in this case, against the defendant, not because of any general or common law negligence, but, solely because of a liability claimed to be imposed by a Statute of the State of New York, the Labor Law, constituting Chapter 31 of the Consolidated Laws, Section 202, as amended by Laws 1937, c. 84, § 2, as in effect on October 14, 1937, the date of the accident, which reads as follows:

"§ 202. *Protection of persons engaged at window cleaning.* On every public building where the windows are cleaned from the outside, the owner, lessee, agent, manager or superintendent in charge of such building shall provide, equip and maintain approved safety devices on all windows of such building. The owner, lessee, agent, manager or superintendent in charge of any such public building shall not require, permit, suffer or allow any window in such building to be cleaned from the outside unless means are provided to enable such work to be done in a safe manner in conformity with the requirements of this chapter and the rules of the industrial board. Every employer or contractor shall require his employee while engaged in cleaning any window of a public building from the outside, to use the equipment and safety devices required by this chapter and the rules of the industrial board. No person shall clean any window of a public building from the outside unless the equipment and safety devices required by this chapter and the rules of the industrial board are provided for his protection and used by him while engaged at cleaning such window.

"The industrial board may make rules supplemental to this section by designating safety devices of an approved type and strength to be installed on public buildings or to be worn by window cleaners or both, but the absence of any such rules shall not relieve any person from the responsibility placed upon him by this section."

The safety equipment and devices provided for by the rules of the Industrial Board, adopted pursuant to the statute, were (1) ladders, (2) sectional ladders, (3) swinging scaffolds, (4) boatswains chairs, or (5) belts, terminals and anchors.

■ The building in question was a public building, as defined by the statute, and the said defendant was the owner "in charge" and in control of the said building.

The only safety equipment, hereinbefore referred to, used in the cleaning of the windows on defendant's building with which we are concerned was the swinging scaffold, although a boatswains chair was also used, but played no part in the injuries to the plaintiff, of which complaint is made in this action.

As to the swinging scaffold no complaint is made as to any part of it, except the rope sustaining it on the end where plaintiff worked, therefore, the principal question in this case is whether the said rope, provided for the work, that parted, was an adequate and safe rope for use on said scaffold to sustain the weight of the scaffold, the men working thereon, and the materials, which would be expected to be used thereon.

■ The right and duty of this Court to set aside the verdict, if it was clearly against the weight of the evidence, needs no citation of authority.

■ On this motion, however, the Court must assume, as established, all the facts that plaintiff's testimony reasonably tends to prove, together with all inferences in plaintiff's favor which may fairly be drawn from the facts. Gunning v. Cooley, 281 U. S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720.

■ It is not a sufficient ground for a new trial that a verdict is merely against the preponderance of the evidence, but it must be so clearly against the evidence as to compel the conclusion that the verdict is contrary to right and Justice. Mt. Adams & E. P. Inclined Ry. Co. v. Lowery, 6 Cir., 74 F. 463, 465, 473.

■ It is contended on behalf of the defendants that Section 202 of the Labor Law, supra, is unconstitutional and that properly construed it imposes no liability on the defendant American Chicle Co.

With these contentions I cannot agree, because I am bound by the decision of the Circuit Court of Appeals of this Circuit in Osborne v. Salvation Army, 107 F.2d 929.

The breach of the Statute, pleaded in this case, is the permitting suffering or allowing by the owner of the building, the defendant American Chicle Co., the windows to be cleaned on the outside by the plaintiff without there being provided a safe rope for the scaffold, and I held and so charged that such a breach of a Statutory provision constituted negligence as a matter of law.

This, it seems to me, is in accord with the holding of the Circuit Court of Appeals in Osborne v. Salvation Army, supra.

The language of Section 202, supra, is very broad, and I believe broad enough to cover in the case at bar.

I am not unmindful of the contention that by the section in question the Legislature sought only to make the failure of the owner of the building guilty of negligence if he failed to provide those things which were a part of the building and customarily used in outside window cleaning. The language of the Section, however, is much broader than would have been necessary for the accomplishment only of that purpose, and the purpose of the Legislature seems to me to have been to make the owner, lessee, agent, manager or superintendent in charge of the building liable if he or they permitted, suffered or allowed any window in such building to be cleaned from the outside unless means were provided to enable such work to be done in a safe manner in conformity with the requirements of Section 202, supra, and the rules of the Industrial Board, and that seems to me to have been the holding in Osborne v. Salvation Army, supra.

The furnishing of a safe scaffold for an outside window cleaner was imposed by the provisions of the law itself, and the rules of the Industrial Board.

■ The duty imposed by the Statute upon the defendant is personal and may not be delegated, nor could the duty imposed upon the defendant be contracted away, nor does it seem to me that the liability of the defendant depended upon notice or knowledge of the defective condition, but, on the contrary, the statute imposed upon the defendant the duty of inspection to see that the instrumentalities provided were safe and adequate for the work. Citation of authorities for these holdings seem to be unnecessary.

■ Neither contributory negligence, nor assumption of risk, constitute defenses to such an act, therefore, plaintiff has a right of recovery against the defendant, if it failed in its duty to see that a safe scaffold was provided. Osborne v. Salvation Army, supra.

There is, therefore, no question, insofar as plaintiff is concerned, of primary liability and secondary liability as to the defendant and the third party defendant.

This, however, does not, as the third party defendant contends, dispose of the issue as between it and the defendant, because under the contract, which existed, between the defendant and the third party defendant, it was the duty of the third party defendant to furnish a safe and proper scaffold for the doing of this work, and if, as plaintiff contends, the rope in question, which was the only part of the scaffold complained of, was not proper and adequate for the work to be performed, then the third party defendant would be answerable over to the defendant, for the damages caused by the unsafe condition of that rope, in the same manner as would anyone be, who had sold the rope to the defendant, for the performance of this work.

■ The defendant and third party defendant were not joint tort feasors but the third party defendant which furnished the rope, if the rope was unsafe and inadequate, was the wrong doer, and primarily liable to the defendant. It clearly appears in the agreement between the defendant and third party defendant that a scaffold was to be used and the third party defendant provided the scaffold and rope, and if the rope as provided was unsafe and inadequate the third party defendant is liable over to the defendant. American Emp. Ins. Co. v. Brandt, 252 App.Div. 506, 299 N.Y.S. 984; Phoenix Bridge Co. v. Creem, 102 App.Div. 354, 92 N.Y.S. 855, Affirmed, 185 N.Y. 580, 78 N.E. 1110; Birchall v. Clemons, 241 App.Div. 286, 271 N.Y.S. 547.

■ Section 211-a of the Civil Practice Act, cited on behalf of the third party defendant, has no application in the case at bar, because the affirmative act of negligence, if there was any, was, as between the defendant and third party defendant, that of the third party defendant which provided the rope in question.

■ This Court did not err in submitting to the Jury the question of liability as between the defendant and third party defendant. Eisenberg v. Kemp, 256 App.Div. 698, 11 N.Y.S.2d 449.

The sole alleged defect in the scaffold on which plaintiff bases his case is the rope in question.

■ Plaintiff contends and I believe properly, that under Section 202 of the Labor Law, supra, the defendant was bound to see that plaintiff was provided and equipped with an adequate and safe rope for use upon the scaffold, and to maintain the same in an adequate and safe condition. This of course would carry with it the duty of inspection.

■ The burden of proof rested on the plaintiff to show that the rope, so provided, was not adequate and safe.

This is the principal issue in this case.

It clearly appears that good new ropes were provided by the third party defendant on or about May 8, 1935 for the boatswain's chair, which is not in issue here, and on February 28, 1936 and April 29, 1937 for the scaffold with which we are concerned.

■ Plaintiff testified that in or about the month of August, 1937, while using the scaffold, with the good and comparatively new ropes, the same caught in a window on the third floor of the building of the defendant, and was cut. On behalf of the defendants expert evidence was offered to show that the rope could not have been cut as testified. This cutting, however, was a collateral matter, but in any event the question of fact was for the Jury to decide and the evidence was sufficient to sustain their finding.

Plaintiff further testified that on the order of his superior, Mr. Grossman, the Sales Manager of the third party defendant, he substituted, in the place of the rope that had been cut, an old rope in the possession of the third party defendant, for which one of the new ropes had been substituted, and that the old rope in question was the one which broke causing the damage of which complaint is made in this case.

The scaffold with the rope in question had been used when required without any accident from August, 1937, the time it was substituted, until it parted, as alleged in this action.

On or about October 1, 1937, the window cleaners in the employ of the third party defendant, including the Plaintiff, joined in a strike of window cleaners, which was quite generally throughout the City.

The plaintiff, with others, received an increase in wages, and returned to work for the third party defendant on or about the 6th day of October, 1937, cleaning windows in buildings in the Borough of Man-

hattan, and on October 14, 1937, he returned to work cleaning the windows on the defendant's building in question.

The plaintiff testified that he and a fellow worker Moore, on September 30th, before the strike started, rigged the scaffold and according to custom brought it to a position a short distance above the ground, made fast the rope at each end, by which it was supported, and then united in jumping up and down on the scaffold to test it. This was a method they had used for a considerable period of time to test the adequacy and safety of the scaffold.

Plaintiff offered the evidence of some witnesses, who claimed to be experts, to show that the proper customary test in the New York City area was, to cause a considerable number of men to go on the scaffold so that the weight would be a number of times that which the scaffold was to be used to sustain.

I do not know what weight the Jury gave to that evidence, but the fact remains that no inspection was made at any time by the said defendant.

After this test the plaintiff and his fellow workman Moore raised the scaffold to the top floor of said defendant's building, and when the strike started the men, including the plaintiff, left the scaffold and ropes suspended at the top floor.

The defendants attempted to show that the parting of the rope was an act of sabotage during the strike, but offered no direct evidence to sustain that contention.

While it is true that access to the building might have been obtained by persons bent upon cutting the rope, there is no direct evidence that that was done, and said defendant apparently bases its contention that the cutting of the rope was an act of sabotage, on the statement which said defendant's witness Grossman testified, that the plaintiff made to him while in the hospital a day or two after the accident that "it looked like they got me" and that Grossman knew that by "they" the plaintiff meant "the strikers".

Plaintiff denied making any such statement.

All of this was submitted to the Jury with proper instructions and their finding as to it cannot be disturbed.

After resuming work on the scaffold it progressed for about a half hour, when in manipulating the ropes to change the position of the scaffold between the third and fourth floors the rope on plaintiff's side of the scaffold parted, and he was thrown to the ground landing on a concrete platform, and received injuries. The rope fell to the platform, and was lying there, as testified by the witness Moore, when the two detectives of the Police Department arrived. They said that the rope did not appear to be cut, but was torn apart, and was in two pieces. They described the conditions of the two ends where the rope had parted, which they said clearly indicated that it had not been cut. These detectives were interested in seeing if there had been a violation of law.

One of the detectives, Thomas J. Devery, said that he examined the rope, which was black, and the break was uneven, irregular, shredded like, and one of the three strands of the rope was pulled tight, and looked as if it forced the other two strands uneven; that is, one strand would be pulled tight, and the other two would be buckled up, humped. Detective Joseph M. Burke testified that he also examined the rope when he arrived at defendant's building, and described its condition substantially the same as Detective Devery. He further testified that he talked with Mr. Grossman, while they were examining the rope, and that Mr. Grossman did not say to either of them that the rope had been cut, or that he suspected any sabotage.

The witness Scott, an officer of the defendant, testifying in its behalf, said that he did not inspect or handle the rope himself, but was present at the time the detectives inspected it, and stood about a foot away from them, from which point he observed that two strands of the rope were cut, and one had broken, but that he did not say to either detective, the rope had been cut.

There is some slight conflict between the testimony of the witness Scott, and the two detectives, and the Jury had the right to determine which story they would accept.

The detectives took the two pieces of rope to the Station House, both of which were at the left end of the scaffold, the end at which the plaintiff had worked, and put the rope on the floor of the record room, where Burke afterwards saw it many times, up to and during the week of September 4, 1938. Burke further testified that he called Grossman by the Telephone

number he had given him, and requested that the rope be called for and removed, and gave instructions that somebody would call for the rope, and if they properly identified themselves, to release the rope and get a receipt.

The rope was called for and a receipt taken.

The defendant offered the evidence of experts, who saw the rope in the record room at the Station House, and were of the opinion the rope had been cut. This conflict, however, in the evidence, was one for the decision of the Jury.

That the rope examined by the detectives was the rope that had been used on the scaffold, was testified to by the witness Moore, called by the plaintiff, who was a fellow worker on the scaffold with the plaintiff when it fell, and who saved himself by his hold upon the rope at the other end, which did not break. He was helped through a window into one of the lofts, started down stairs, and after the lapse of three or four minutes, arrived at the place where he found the plaintiff, and testified that the rope that had broken had fallen on the platform beside the plaintiff, and stayed there until the detectives came and took it away.

Moore was not called, or interrogated about other matters, though he remained in Court under subpoenas from both sides.

The evidence did not show that he was under the control of either party, as he left the employ of the said defendant some time before the trial, therefore, no presumption arises as to whom his testimony would have helped, or injured.

From that point on there was not evidence of continuity of possession, which would have been sufficient to have permitted the introduction of the rope in evidence.

Plaintiff contends that the rope was taken from the Police Station to the said defendant's building, and there placed in the basement.

Plaintiff testified without objection that Moore told him that he took the rope to the Chicle Company building, and placed it in the basement, and later told him that if he wanted the rope, he could have it, as the Chicle Company had requested that the basement be cleaned up.

In May, 1939, plaintiff went with another colored man in a car to the defendant's premises and obtained the rope. Plaintiff further says that in the car he first tied a piece of rag around the rope on each of the broken ends, and then a piece of red · string; that he brought the rope to his Attorney's office, where it was placed in a box, in which it was brought to Court.

When the rope arrived at Court, it was in four pieces. Plaintiff thereupon called an Analytical Chemist, who testified that an assistant to the plaintiff's Attorney brought certain rope to him in two parts; that he tested the rope by attaching it to certain tensil machinery, which pulled it apart, and this accounted for the fact that the rope, produced at the trial, was in several parts. He testified that he found traces of acid on the rope. He also testified that the rope was brought to him by the assistant or investigator, employed by the plaintiff's Attorney, and that the rope he received from him, he delivered back to him, and the assistant or investigator of the plaintiff's Attorney testified that the pieces of rope produced in Court were those he had received from the Analytical Chemist. Defendants properly criticise the failure of the Analytical Chemist to ascertain the tensil strength of the rope when he broke it, but that is excused by the fact that he was simply looking for evidence of acid.

 It thus clearly appears that there was no proof of continuous possession, which would have justified the admission of the rope in evidence, but the plaintiff testified that it was the rope that broke and that he recognized it by the knot, which was in the end of that portion of the rope, which was ordinarily used in pulling. The knot was a common knot, of a kind frequently made, and while there would have been a doubt in my mind as to the ability of the plaintiff to identify the rope by the knot, still, I cannot say that that would be impossible, and I believe that it presented a question of fact for the Jury.

 The Jury was carefully instructed on this matter, and considering the testimony that had been given by the detectives as to the condition of the rope when found, immediately after the accident, and the testimony of the plaintiff that it was the only rope that he used that had one knot in it, and that knot was at the pull end and "I know this knot", I cannot say that the verdict of the Jury is so clearly against the

weight of the evidence, that it should be set aside.

It is true that the condition of the rope after the Chemist had caused it to part in several pieces was not the same as it was immediately after plaintiff fell, but this was clearly explained to the Jury in the Charge, and it also appeared that the rope showed the puckered condition, described by the plaintiff.

The evidence offered by the plaintiff, as to the rope, was certainly not weakened by the testimony offered on behalf of the defendants, as to what became of the rope after it was taken from the Police Station.

That the third party defendant, with the knowledge that its representative Mr. Grossman had, as to the action brought by plaintiff against defendant, would have disposed of the rope in the manner described, seems to be altogether unreasonable.

It is true that defendants called experts, who testified that the rope in their opinion had been cut, but there was no evidence offered to show how it was cut, and the question as to whether it was cut or broken was clearly one for the Jury, and their determination should not be upset.

The plaintiff further offered evidence that the rope had been weakened by acid used in cleaning windows and the Analytical Chemist, called by plaintiff, testified that he found that there was evidence of acid in the rope.

The use of acid in cleaning of windows where the scaffold and rope in question were used, was disputed by the defendant, who called Mr. Grossman, the representative of the third party defendant, who said that where acid was used, the defendant was always billed for it, and also offered records to show that the defendant had not been billed for acid in the cleaning of windows where the said scaffold and rope were used. This, however, presented a question of fact for the Jury, and their decision should not be disturbed.

The chief complaint, as I understand it, is that the Court erred in receiving in evidence the rope offered by the plaintiff, and that the Jury was prejudiced thereby, and that the finding of the Jury that the plaintiff was injured by the breaking of the rope is so strongly against the weight of the evidence, that Justice and right require that a new trial should be granted.

The chief support for this contention, as I view it, is that the Jury was prejudiced by reason of the condition of the rope after having been broken by the Analytical Chemist, but it seems to me that this whole question was so carefully considered in the Charge, that, assuming as we must that the Jury followed the Court's instructions on the Law, they must have taken all that into consideration, and found that the accident was caused by the breaking of the rope. The condition of the rope, at and before the accident, was clearly explained by the plaintiff, and we must not be unmindful of the fact that there was no inspection of the rope whatever by defendant or third party defendant immediately before the commencement of its use, during which it parted, but the only inspection and test of the rope was made by the plaintiff and his co-worker, when they hung the scaffold before the strike started, and that during the time they were on strike the scaffold was left hanging on the building, and plaintiff and his co-worker resumed work on the scaffold without any inspection or test, and that about a half hour thereafter the rope broke and the scaffold fell.

No explanation is found for the breaking of the rope, from any cause, except its inability to sustain the weight of the scaffold and the men engaged in work thereon by reason of its unsafe condition.

The rope was inadequate and unsafe, and the said defendant had not complied with the requirements of the statute.

Many cases are cited, on behalf of the defendants, to show that this Court alone, and not the Circuit Court of Appeals, has the right to weigh the evidence and set aside the verdict as against the weight of the evidence, but that does not seem to me to furnish any reason for setting aside the verdict, unless the Court is convinced that the verdict is so clearly against the weight of the evidence that it would be contrary to right and Justice to allow it to stand, and I can not so find.

I find no error in my Charge to the Jury, with reference to the obligation of the owner, which I believe was in accord with the decision in Osborne v. Salvation Army, supra, which is controlling upon this Court.

The question of constitutionality does not require extended consideration as that seems to me to have been determined in Osborne v. Salvation Army, supra.

This brings us to the consideration of the amount of the verdict.

That the plaintiff suffered severe bodily injuries cannot be disputed, and that his average weekly wage was $35 seems to be clearly shown.

There is no evidence that the injuries of the plaintiff, although permanent, will prevent him from doing any kind of work; on the contrary, it seems to me to be clearly apparent from the evidence that he will be able to do some work if he be not able to do window cleaning. He did carry a cane, but moved about the Court room at the trial without using it.

From a medical standpoint, it would appear that in his case there has been a favorable result.

While it is true that he had a compression fracture of the lumbar vertebra, no operation will be required, because nature has done for him exactly what the physicians would have recommended, that is, immobilized the vertebra affected.

The restriction of motion caused by immobilizing these vertebra is very slight, as the bending is generally from the hips, and also the restriction of motion of the wrist is slight.

Taking into consideration his age, expectancy of life, and the fact that he will be able to do some work, the award of $35,000 is excessive.

Of course, there must be an allowance for pain and suffering, and for expenses and the loss of earning power, and all those things which go to make up his damages, but that would clearly be met by an award of $20,000.

Unless the plaintiff shall, within ten days, stipulate to a reduction of the amount of the verdict to $20,000, the motion of the defendant to set aside the verdict against it will be granted, on the ground that it is excessive, but, if the plaintiff shall so stipulate, then the motion to set aside the verdict will be denied on all grounds stated.

As the third party defendant can only be liable to the said defendant for the amount of the verdict against the defendant recovered by the plaintiff, the motion of the third party defendant to set aside the verdict against it, recovered by the defendant, shall abide the determination of the plaintiff as to stipulating the reduction of this verdict and if he shall, within ten days, stipulate to reduce the amount of the verdict to $20,000 then the amount of the ver-

dict rendered against the third party defendant will be reduced to $20,000, but, if the plaintiff shall not so stipulate, within ten days, the motion of the third party defendant will be granted.