Thomas F. MEEHAN, as Administrator
of the Estate of Andrew T. Gill,
Deceased, Plaintiff,

v.

CENTRAL RAILROAD COMPANY OF
NEW JERSEY, Defendant.

United States District Court
S. D. New York.

Jan. 12, 1960.

Thomas F. Meehan, New York City, for plaintiff.

Vincent E. McGowan, New York City, for defendant, Joseph P. Allen, New York City, of counsel.

LEVET, District Judge.

This action was brought by the plaintiff, a New York resident, appointed by the Surrogate's Court of New York County, State of New York, as the general administrator of the estate of the decedent, Andrew T. Gill, who at the time of his death was a resident of the State of New Jersey, to recover damages for the wrongful death of said decedent pursuant to N.J.S.A. 2A:31–1; and for conscious pain and suffering pursuant to N.J.S.A. 2A:15–3 claimed to have been sustained by the decedent prior to death as a result of the negligence of the defendant in the operation of one of its trains in the State of New Jersey. The defendant is a New Jersey corporation. The plaintiff also sought to recover punitive damages on both causes of action.

The decedent, an attorney, died from drowning on September 15, 1958, when the train in which decedent was a passenger commuting from his home in Rumson, New Jersey to New York passed through the opening of the Newark Bay Drawbridge at Bayonne, New Jersey, into the waters below. Decedent, 39 years of age at the time, was survived by his widow, Ruth A. Gill, 36 years old at that time, and five children, then of the ages of 2 to 8.

The action was instituted in this court by virtue of the alleged diversity of citizenship of the parties. A motion by the plaintiff for interlocutory summary judgment on the issue of liability was denied by Judge Frederick v. P. Bryan of this court on June 22, 1959. The plaintiff moved to obtain a preference on the court calendar on the ground that the health and financial need of decedent's widow required quick action. Chief Judge Sylvester J. Ryan granted this motion on June 26, 1959 to the extent of placing the suit at the head of the Ready Day Trial Calendar for the November 1959 Term. The case was tried on November 4 through 13, 1959, and the verdict rendered on November 12, 1959.

■ The cause of action for punitive damages for the wrongful death of the decedent was dismissed by this court. The New Jersey Wrongful Death Statute, N.J.S.A. 2A:31–1 to 2A:31–6, limits the recovery to "such damages as they [the jury] shall deem fair and just with reference to the pecuniary injuries resulting from such death." N.J.S.A. 2A:31–5.

■ It is the general rule in this country that exemplary or punitive damages for death are not recoverable under statutes modeled after Lord Campbell's Act, or under other forms of statute which do not expressly or by clear implication confer a right to such damages. See Annotation, 94 A.L.R. 384, 386; 16 Am. Jur., Death, § 185, p. 124.

The New Jersey courts have held that a plaintiff is entitled to recover nothing but the pecuniary loss suffered by the next of kin. See May v. West Jersey & S. R. Co., 62 N.J.L. 67, 42 A. 165; Odlivak v. Elliott, D.C.D.Del.1949, 82 F. Supp. 607.

It was stated by the Supreme Court of New Jersey in Turon v. J. & L. Const. Co., 1952, 8 N.J. 543, 86 A.2d 192, that "the evident policy of the statute is the recovery of damages for the pecuniary injury sustained by the designated beneficiaries. The act is essentially remedial rather than penal." 86 A.2d at page 198.

In accordance with the compensatory nature of the New Jersey Wrongful Death Statute, the punitive damage action on the wrongful death was dismissed.

By stipulation entered into between the parties during the course of the trial, the defendant conceded liability for the accident which caused the decedent's death. (SM 204–06)

The defendant reserved the right to move at the appropriate time for the dismissal of the cause of action based on pain and suffering. The defendant also reserved the right to move to dismiss all causes of action on the ground of lack of jurisdiction of the court and on the further ground that the plaintiff had no capacity to bring this action since the cause of action for wrongful death is specifically given to the administrator

ad prosequendum under N.J.S.A. 2A:-31-2.

With respect to the punitive damages, if any, to which the plaintiff would be entitled on the cause of action alleging pain and suffering, it was stipulated between the attorneys for the parties (defendant, however, reserving its right to move to dismiss this phase of the action) that 10% would be added to whatever sum, if any, the jury awarded on the cause of action for pain and suffering.

After trial the jury awarded to the plaintiff the sum of $315,000 on the cause of action for wrongful death and $10,000 on the cause of action for conscious pain and suffering.

After the verdict the defendant addressed a number of motions to the verdict, as follows:

With respect to the first cause of action for wrongful death, the defendant moved to set aside the verdict and for a new trial on the grounds of excessiveness of the verdict; the misconduct of plaintiff's attorney during the trial; and alleged inflammatory summation.

With respect to the cause of action for pain and suffering, the defendant moved to set aside the verdict in favor of the plaintiff and for judgment notwithstanding the verdict in favor of the defendant on the ground that there was no evidence to support a verdict for pain and suffering. The defendant moved in the alternative to set aside the verdict in favor of the plaintiff and for a new trial.

With respect to the punitive damages which were governed by the stipulation aforesaid, defendant moved for a directed verdict on the ground that there was no basis for the award of any punitive damages.

With respect to the question of jurisdiction, the defendant moved to dismiss the complaint on the grounds that the court lacked jurisdiction of the parties in that there was no diversity of citizenship and that the plaintiff as general administrator did not have the capacity to sue under the New Jersey Wrongful Death Statute which gives the right of action to an administrator ad prosequendum. N.J.S.A. 2A:31-2.

After the verdict the plaintiff moved for the court to add interest at the rate of 6% on the verdict of $315,000 from September 15, 1958 to November 12, 1959.

The jurisdiction question is considered first.

I. Motion as to Jurisdiction.

The jurisdiction of this court is based upon diversity of citizenship, 28 U.S.C.A. § 1332(a), in that the plaintiff, appointed general administrator of the estate of the decedent by the Surrogate's Court of New York County, is a resident of the State of New York, while the defendant is admittedly a New Jersey corporation. The decedent was a resident of New Jersey and his widow and children, the beneficiaries of the cause of action for wrongful death, are residents and citizens of the State of New Jersey.

The contentions of the defendant that this court lacks jurisdiction are as follows:

1. The appointment of the plaintiff as general administrator by the Surrogate's Court of New York County was based upon misrepresentations of fact and failure to state material facts constituting fraud upon the Surrogate's Court to a degree sufficient to cause the letters of administration issued thereunder to be void and to divest this court of jurisdiction by reason of Section 1359 of Title 28, U.S.C.A.

2. Since the New Jersey Wrongful Death Act (N.J.S.A. 2A:31-2) provides that the action is to be brought in the name of an administrator ad prosequendum, who is regarded by the New Jersey courts as a nominal party and a mere trustee for the bringing of the action, the plaintiff is not the real party in interest and his citizenship is not controlling in determining the requisite diversity of citizenship.

3. The plaintiff lacks capacity to sue in that the New Jersey statute (N.J.S.A. 2A:31-2) requires the action to be brought by an administrator ad prose-

quendum and the plaintiff is a general administrator appointed in New York.

We consider these contentions in order.

First: Defendant maintains that the appointment of the plaintiff as administrator was fraudulent and collusive and jurisdiction is not present by virtue of Section 1359 of Title 28, U.S.C.A. That section reads:

> "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

■ However, the federal courts in interpreting the section have held that it does not permit an inquiry into the motives and purposes which actuate the appointment of the administrator. Corabi v. Auto Racing, Inc., 3 Cir., 1959, 264 F.2d 784; McCoy v. Blakely, 8 Cir., 1954, 217 F.2d 227; Jaffe v. Philadelphia & Western R. Co., 3 Cir., 1950, 180 F.2d 1010.

■ Moreover, the courts have long expressed a reluctance to permit a collateral attack on such a probate decree. See Mecom v. Fitzsimmons Drilling Co., 1931, 284 U.S. 183, 189, 52 S.Ct. 84, 87, 76 L.Ed. 233, wherein the court stated: "His appointment was regular and in accordance with the statutes; and the decree of the probate court may not be collaterally attacked in the present proceeding." See also McGehee v. McCarley, 5 Cir., 1899, 91 F. 462; American Car & Foundry Co. v. Anderson, 8 Cir., 1914, 211 F. 301.

Nevertheless, that reluctance may be overcome when, as here, the attack alleges fraud in relation to the jurisdictional facts on the basis of which the Surrogate's Court issued the letters of administration. The defendant alleges: "But for these misrepresentations the Surrogate's Court of New York County would not have had jurisdiction. In fact

since the Surrogate's decree was obtained on the basis of these misrepresentations the letters issued to the Plaintiff herein are void and are subject to collateral attack in this Court." (Defendant's Brief, p. 4).

Cases denying collateral attack have taken pains to point out that no fraud as to the jurisdiction was involved. See Mecom v. Fitzsimmons Drilling Co., 1931, 284 U.S. 183, 189, 52 S.Ct. 84, 76 L.Ed. 233; Jaffe v. Philadelphia & Western R. Co., 3 Cir., 1950, 180 F.2d 1010, 1012; McCoy v. Blakely, 8 Cir., 1954, 217 F.2d 227; Harrison v. Love, 6 Cir., 1936, 81 F.2d 115.

The Supreme Court has pointed out that: "Collusion to satisfy the jurisdictional requirements of the District Courts may, of course, always be shown; and it will always defeat jurisdiction." Smith v. Sperling, 1957, 354 U.S. 91, 93, 77 S.Ct. 1112, 1116, 1 L.Ed.2d 1205. See also Kucharski v. Pope & Talbot, D.C.S.D.N.Y.1944, 4 F.R.D. 208, 210.

The fraud and collusion alleged by the defendant to have taken place in obtaining the letters of administration consist of alleged misrepresentations and alleged failures to state pertinent facts. These misrepresentations and omissions claimed are as follows:

A. Petition for appointment of a general guardian.

1. In his petition to be appointed guardian of the property of the infant child, Andrew T. Gill, Jr., plaintiff alleged that the decedent died leaving no assets except in New York County consisting in part of 15,000 shares of capital stock of the Squared Circle System Inc.,[1] a New York corporation. (Defendant's Exhibit E.) In her supporting affidavit, the decedent's wife alleged this stock was "over-the-counter" stock. (Defendant's Exhibit E.)

2. In his petition for guardianship it was also alleged by the plaintiff, upon information and belief, that decedent had

---

1. This corporation was engaged in the promotion and sale under a license from a Swiss corporation of a certain device for use in the automatic parking of cars in a garage.

due and owing to him between $600 and $1,000 for legal services in the New York law firm for which he worked as his share of fees for drafting pension plans.

3. The widow's supporting affidavit stated that her husband's estate would not amount to more than $2,500.

4. In the petition for appointment as general guardian and in the supporting affidavits, there is no reference to any claim which the decedent's beneficiaries had against the defendant herein as a result of decedent's wrongful death.

B. Petition for letters of administration.

5. In his petition for letters of administration (Defendant's Exhibit D), plaintiff again alleged that the decedent's estate consisted of assets not exceeding the sum of $2,500, consisting of 15,000 shares of the Squared Circle System Inc., a certificate of Investors' Planning Corporation of America, and between $600 and $1,000 due or about to be due from the law firm for which the decedent worked.

6. The plaintiff further alleged in that petition (Defendant's Exhibit D): "There is no right of action belonging to the Estate except a cause of action against Central Railroad of New Jersey for the suffering caused decedent prior to his death by accident. A cause of action does exist for the benefit of the spouse and children of decedent based upon the death of decedent."

The defendant alleges that testimony on the trial establishes that the stock owned by the decedent in the Squared Circle System Inc. had never been sold "over-the-counter"; that testimony of a witness, Mr. John A. Wirth, a member of the New York law firm where decedent was employed, shows that there was nothing due to the decedent from his law firm at the time of decedent's death; that plaintiff knew the decedent had a joint interest in real estate in the State of New Jersey; and that the Squared Circle System Inc. is defunct and the stock was, prior to decedent's death, and is, in fact, worthless.

It is the contention of the defendant that these misrepresentations and omissions constitute fraud upon the Surrogate's Court to a degree sufficient to void the letters of administration and divest this court of jurisdiction under 28 U.S.C.A. § 1359.

I cannot agree. I find no material misrepresentations of fact here or any omission sufficient to constitute fraud or collusion.

■ The evidence at the trial shows that the stock was not sold "over-the-counter." (SM 797, testimony of John A. Wirth, Secretary of the Squared Circle System Inc.) However, I do not think that this is a material misrepresentation or that the widow of the decedent should be held to a strict definition of this term in an investment sense. It is true that the sales of the stock were only of shares originally authorized by the corporation, sold by the corporation and by private shareholders. But several private sales apparently did take place in February of 1958 and there was a sale of the stock on July 15, 1958 to a Mr. Ferris. (SM 792)

■ There is no evidence to support the contention of the defendant that the stock was worthless at the time of decedent's death. It is true that an appraisal of the stock would be difficult but the occasional purchases show that some value existed.[2] The present worthlessness of the stock stems from the subsequent revocation of the license of the Squared Circle System Inc. by Buss, Limited, Basle, Switzerland, in June, 1959.

There was no testimony by Mr. Wirth, a member of the firm where decedent was employed, concerning monies owed to decedent at his death, so the claimed misrepresentation there is not a factor.

2. As a matter of fact, the decedent appears to have sold 6,500 shares of this stock in 1955 for $500 and in 1956 to have sold 2,500 shares for $250. (See Income Tax Return of 1956, Exhibit 15.)

■ As far as the joint interest in real estate in New Jersey, at the death of the decedent this interest vested in the widow so that it was not an asset of the decedent's estate.

■ The listing of the causes of action in the petition for letters of administration is an accurate one. The only cause of action belonging to the estate is the action for pain and suffering prior to death. The cause of action for the death is for the benefit of the surviving spouse and children.

Section 43 of the New York Surrogate's Court Act provides: "Where the jurisdiction of a surrogate's court to make a decree or other determination is drawn in question collaterally, the jurisdiction is presumptively, and, in the absence of fraud or collusion, conclusively, established, by an allegation of the jurisdictional facts, contained in a written petition or answer, duly verified, used in the surrogate's court."

The case of Lapiedra v. American Surety Co., 1928, 247 N.Y. 25, 159 N.E. 710, is cited by the defendant for the proposition that even an innocent misrepresentation of fact with respect to jurisdictional requirements will be held to constitute a fraud upon the court so as to avoid the issuance of letters of administration. That court held that where an allegation in the petition for appointment as administrator de bonis non that a prior administrator had been removed was untrue, the court was induced to exercise its authority when it had no jurisdiction and the appointment was void. The court stated: "This allegation, though innocently made, was untrue, and, because it was untrue as to a matter of record of which the petitioner was chargeable with notice, it amounted to a constructive fraud on the court of the same nature and effect as an actual and deliberate misrepresentation of fact. * * * It was a fraud upon the court, directly affecting the jurisdiction of the court." 247 N.Y. at page 31, 159 N.E. at page 713.

In that case the constructive fraud went to the essence of the court's jurisdiction. Note Swidler v. Knocklong Corp., 1953, 305 N.Y. 527, 536, 114 N.E. 2d 25. The appointment of a new administrator necessarily demanded the revocation of prior letters. Here, there are no misrepresentations in the petition or untrue allegations as to material jurisdictional facts.

The case of Hoes v. New York, New Haven and Hartford R. R. Co., 173 N. Y. 435, 66 N.E. 119, relied on by the defendant, is also not applicable. It is true that the court there permitted a collateral attack upon a Surrogate's decree based on the allegation of fraud or collusion. However, in that case a trifling article of personal property, not exceeding in value $25, *brought* into the state after the death of the intestate on advice of counsel in order to furnish a foundation on which to apply for letters of administration, was held to present a case of collusion and legal fraud in the proceedings before the Surrogate. Here, the value of the shares of stock involved was not trifling and the shares were in this state prior to death, so there was no legal fraud.

Similarly, Pietraroia v. New Jersey and Hudson River Ry., 1910, 197 N.Y. 434, 91 N.E. 120, held that an administrator appointed by fraud or collusion had no standing to sue in New York. There, a joint savings account existed in New York. Upon the death of his wife, instead of withdrawing the monies, the husband withdrew half of the principal sum and then gave the savings bank book to a corporation as security for becoming surety on an administrator's bond. The next day the administrator commenced the action. The court stated: "The whole proceeding on the part of the husband and the plaintiff was such as to justify the belief that they were engaged in a collusive effort to get the action against the defendant into our courts." 197 N.Y. at page 438, 91 N.E. at page 121. Here, the decedent validly acquired 25,000 shares of stock in his own name, Andrew T. Gill, on September 9, 1955 (SM 793) and was the bona fide owner of 19,000 shares at the time of his death.

There was no collusive or fraudulent scheme to bring assets into this jurisdiction.

█ The presumption of regularity of the proceedings in the Surrogate's Court should obtain until there is a clear showing of adequate grounds for the collateral attack. See Hart v. Mutual Ben. Life Ins. Co., 2 Cir., 1948, 166 F.2d 891. There is no such showing here.

I, therefore, as to the first objection, find:

1. Neither plaintiff nor decedent's widow made any material misrepresentations of fact or significant omissions in the petition of the plaintiff for appointment as general guardian or in the supporting affidavit of the widow.

2. Plaintiff did not make any material misrepresentation of fact in his petition for letters of administration.

3. There is no showing of fraud or collusion which would justify a collateral attack on the decree of the Surrogate's Court of New York County in this court.

4. Since the plaintiff, a New York resident, was appointed regularly and validly as the administrator of the estate of Andrew T. Gill, his suit against the New Jersey corporation presents a case where diversity of citizenship is present.

█ Second: The second attack by the defendant on the jurisdiction of this court involves the claim that the plaintiff is not the real party in interest, that he is only a special statutory trustee. Under these circumstances, it is contended, the courts look to the real party to determine diversity and that here, since the beneficiaries are citizens of New Jersey, as is the defendant, there is no diversity.

But for the special nature of the New Jersey statute (N.J.S.A. 2A:31–2), requiring the action to be brought in the name of an administrator ad prosequendum, that claim would be quickly disposed of by the case of Mecom v. Fitzsimmons Drilling Co., 1931, 284 U.S. 183, 52 S.Ct. 84, 76 L.Ed. 233. Faced with a similar claim there, the Supreme Court stated: "The petitioner insists that, where an administrator is required to bring the suit under a statute giving a right to recover for death by wrongful act, and is, as here, charged with the responsibility for the conduct or settlement of such suit and the distribution of its proceeds to the persons entitled under the statute, and is liable upon his official bond for failure to act with diligence and fidelity, he is the real party in interest, and his citizenship, rather than that of the beneficiaries, is determinative of federal jurisdiction. This we think is the correct view. The applicable statutes make the administrator the trustee of an express trust and require the suit to be brought and controlled by him." 284 U.S. at pages 186–187, 52 S.Ct. at page 86. However, N.J. S.A. 2A:31–2 provides only that every action for wrongful death should be brought in the name of an administrator ad prosequendum. Under N.J.S.A. 2A:31–6, payment in settlement of the action or in satisfaction of a judgment in a wrongful death action is made only to the general administrator who has filed a bond adequate to protect the beneficiaries. The administrator ad prosequendum has no power to settle the action.

The New Jersey courts have held that such an administrator ad prosequendum "is but a nominal representative to bring and prosecute the action" (Loughney v. Thomas, 117 N.J.L. 169, 187 A. 329, 331), and "a mere trustee to bring and conduct the action." Cetofonte v. Camden Coke Co., 78 N.J.L. 662, 75 A. 913, 27 L.R.A.,N.S., 1058. See also Carter v. Pennsylvania R. Co., D.C.S.D.N.Y.1949, 9 F.R.D. 477; Baldwin v. Powell, 1945, 294 N.Y. 130, 61 N.E.2d 412.

The terms "real party in interest" and "nominal party" have been the subject of conflict among several circuit courts. In Martineau v. City of St. Paul, 8 Cir., 1949, 172 F.2d 777, the Circuit Court of Appeals for the Eighth Circuit held that under applicable Minnesota law the guardian of a minor is merely an officer or agent of the probate court and al-

though he is a proper party to the record and has control of the prosecution of the action, the minor is the real party in interest. To the same effect is Thames v. State of Mississippi, 5 Cir., 1941, 117 F.2d 949, 136 A.L.R. 926.

In the Third Circuit, the "real party in interest test" is not applied to determine diversity but the courts look instead to capacity to bring and maintain the suit. See Corabi v. Auto Racing, Inc., 3 Cir., 1959, 264 F.2d 784; Fallat v. Gouran, 3 Cir., 1955, 220 F.2d 325; Jaffe v. Philadelphia & Western R. Co., 3 Cir., 1950, 180 F.2d 1010.

The latter viewpoint seems to be preferable in the light of Mexican Central Railway Co. v. Eckman, 1902, 187 U.S. 429, 23 S.Ct. 211, 47 L.Ed. 245, wherein it is stated: "If in the state of the forum the general guardian has the right to bring suit in his own name as such guardian, and does so, he is to be treated as the party plaintiff so far as Federal jurisdiction is concerned * * *." 187 U.S. at page 434, 23 S.Ct. at page 213. The court in Mecom v. Fitzsimmons Drilling Co., 1931, 284 U.S. 183, 52 S.Ct. 84, 76 L.Ed. 233, based its decision concerning the citizenship of an administrator on the Mexican Central Railway Co. v. Eckman case.

It is not necessary to decide for the purpose of this case whether the administrator ad prosequendum could be considered to be the real party in interest or whether, even though he is not the real party in interest, because he has the right to bring the suit in his own name, his citizenship would nevertheless be controlling. The plaintiff in this case is a general administrator appointed by the Surrogate's Court of New York County. He is bringing the action for wrongful death as an administrator ad prosequendum and the payment in satisfaction of the judgment will be turned over to him as general administrator to be distributed in accordance with the laws of New Jersey. He has filed a bond in the sum of $2,500 for the faithful performance of his duties. He has conducted the action. As the general administrator appointed in New York, suing for wrongful death under the New Jersey Death Statute, he is the real party in interest. The factors cited in the Mecom case as illustrative of such a real party in interest are present here.

Accordingly, as to the second objection, I find:

1. That plaintiff, a general administrator appointed in New York, suing under the New Jersey Wrongful Death Act, is the person whose citizenship is controlling in determining whether there is diversity of citizenship.

2. Since the defendant is a New Jersey corporation, diversity of citizenship is present.

▆▆▆ Third: The defendant's final jurisdictional claim is that the right of action in New Jersey is given only to an administrator ad prosequendum and that the plaintiff as general administrator in New York has no capacity to sue. Since the action was instituted in the United States District Court, Southern District of New York, the capacity of the plaintiff to sue is governed by the law of New York. Federal Rules of Civil Procedure, rule 17(b), 28 U.S.C.A.; Carter v. Pennsylvania R. Co., D.C.S.D.N.Y.1949, 9 F.R. D. 477; Brennan v. Rooney, D.C.E.D.Pa. 1956, 139 F.Supp. 484.

The problem of capacity to sue on a foreign death statute was considered in Baldwin v. Powell, 1945, 294 N.Y. 130, 61 N.E.2d 412, 413. The court there stated: "We have said that: 'When a statute creates a liability and prescribes the person who shall have the right to enforce it, the latter is as component a part of the statutory right of action as is the former. The right of the specified person to maintain the action and his existence is as integral in the right of action as the liability of the defendant.' Matter of Meng, 227 N.Y. 264, 277, 125 N.E. 508, 512." See Loucks v. Standard Oil, 1918, 224 N.Y. 99, 110–113, 120 N.E. 198; Restatement of the Law of Conflict of Laws, §§ 391, 396. Comment "c" of Section 396 reads as follows:

"*c. Where particular representative named in statute.* If the death statute of the state of wrong names a particular representative to sue, such as the representative appointed in the state of wrong or the representative at the domicil of the deceased, such representative is the only person who can sue; but such representative may sue in any state as the owner of a claim in trust for certain distributees. * * *"

See Rose, Foreign Enforcement of Actions for Wrongful Death, 33 Mich.L.R. 545.

The issue in the Baldwin case involved the right of an administrator appointed in a foreign state to sue on the wrongful death statute of a foreign state in New York. The general rule is stated to be that a foreign administrator is without standing in the New York courts. Wikoff v. Hirschel, 1932, 258 N. Y. 28, 179 N.E. 249. The court in the Wikoff case stated the problem as follows: "The cases are in conflict upon the question whether, apart from the enabling provisions of that statute or of any other, a foreign administrator suing to recover damages for the death of a decedent is within the general rule, or may be regarded, if so constituted by the law of the state of the injury, as a special statutory trustee, privileged to sue anywhere. * * * We are not required to make a choice of the one theory or the other, for in view of the defendant's waiver the question is not here." 258 N.Y. at pages 31–32, 179 N.E. at pages 250. See Hughes v. Fetter, 1951, 341 U.S. 609, 71 S.Ct. 980, 95 L.Ed. 1212; Currie, The Constitution and the Transitory Cause of Action, 73 Harvard L. Rev. 268, 269, 293 (1959).

The close scrutiny paid by the New York Court of Appeals in the Baldwin case to the person entitled to sue under the foreign wrongful death statute was to determine whether that person was suing for the general estate of the deceased or whether that person was the personal representative of the deceased suing as a special statutory trustee. If the foreign administrator was suing for the general estate of the decedent, he would not be permitted to sue in New York. Baldwin v. Powell, 1945, 294 N. Y. 130, 61 N.E.2d 412. If the foreign administrator was suing for the benefit of a designated group of persons, his capacity to sue in New York was left open in Wikoff v. Hirschel, 1932, 258 N.Y. 28, 32, 179 N.E. 249.

In Cooper v. American Airlines, Inc., 2 Cir., 1945, 149 F.2d 355, 162 A.L.R. 318, Judge Frank, in attempting to answer that open question, held that New York would permit a Pennsylvania executrix to maintain an action on a Kentucky Wrongful Death Statute where, under that statute, the executrix was merely a nominal plaintiff and the statute made her a special trustee.

Therefore, the emphasis by the New York Court of Appeals in Baldwin v. Powell, 1945, 294 N.Y. 130, 61 N.E.2d 412, on the person entitled to sue under the foreign death statute was to determine whether that person had the capacity to sue in New York. ("We must, therefore, look to the Florida death statute [F.S.A. §§ 768.01, 768.02] to determine who is the person designated to enforce the cause of action and to the law of New York to determine whether such person is qualified to sue in the courts here." 294 N.Y. at page 133, 61 N.E.2d at page 413.) That is not the problem here as the plaintiff is not a foreign administrator, but was appointed in New York.

The problem arising from the attempt of an administrator appointed in a foreign state to sue on the New Jersey Wrongful Death Statute, which requires suit to be brought by an administrator ad prosequendum, was considered in Brennan v. Rooney, D.C.E.D.Pa.1956, 139 F.Supp. 484 and Public Service Electric Co. v. Post, 3 Cir., 1919, 257 F. 933.

In Brennan v. Rooney, the district court, relying on Pennsylvania law, dismissed a complaint on the ground that a general administrator appointed in Pennsylvania did not have capacity to sue under the New Jersey Wrongful Death Act.

The Pennsylvania law provided that where an action for wrongful death arising under the laws of some other jurisdiction is brought in that Commonwealth, "it shall be brought by the person authorized to bring the action by the law of the jurisdiction where the cause of action arose." Pa.R.C.P. No. 2207, 12 P.S.Appendix.

In Public Service Electric Co. v. Post, 3 Cir., 1919, 257 F. 933, it was held that an administrator with limited letters appointed in New York under the Code of Civil Procedure § 2559 et seq. had substantially the same powers as an administrator ad prosequendum in New Jersey and could therefore bring an action under the New Jersey Wrongful Death Act.

The capacity to sue should not be governed merely by the name given to the party designated as the proper person to sue. The Supreme Court recognized as much in Stewart v. Baltimore & O. R. Co., 1897, 168 U.S. 445, 18 S.Ct. 105, 42 L.Ed. 537. That case involved the right of an administrator appointed in the District of Columbia to bring suit there for a death occurring in Maryland. The court noted that the statute in Maryland provided that the suit should be brought in the name of the state, but considered this factor was not important in view of the fact that the essential nature of the two statutes was similar.

Similarly, the reasoning of Dennick v. Railroad Co., 1880, 103 U.S. 11, 26 L.Ed. 439, is applicable here. That court held only that an action for wrongful death in New Jersey could be brought in New York. At that time the action could have been brought in New Jersey by the personal representative of the deceased. The court noted: "The statute says the personal representative shall recover, and the recovery be for the benefit of the widow and the next of kin. It would be a reproach to the laws of New York to say that when the money recovered in such an action as this came to the hands of the administratrix, her courts could not compel distribution as the law directs." Id. at page 20. Here, the courts of New York will compel distribution of the recovery in the manner provided for in the New Jersey statute.

This reasoning has been adopted by lower courts in New York. In Jongebloed v. Erie R. R. Co., Supreme Court, Special Term, New York County, 180 Misc. 893, 42 N.Y.S.2d 260, affirmed 1st Dept., 1943, 266 App.Div. 960, 44 N.Y.S.2d 681, it was held that in an action for wrongful death occurring in New Jersey, an administrator, legally appointed in New York, could sue without going through the formality of having an administrator ad prosequendum appointed in New Jersey.

In O'Brien v. Thellusson, Supreme Court, Special Term, Kings County, 1943, 180 Misc. 189, 39 N.Y.S.2d 849, it was held that an administratrix with limited letters (Surrogate's Court Act, §§ 89, 122) was a proper person to institute an action based on the New Jersey Wrongful Death Act and that it was unnecessary for an administratrix ad prosequendum to be appointed by New Jersey. See Kroger Grocery & Baking Co. v. Reddin, 8 Cir., 1942, 128 F.2d 787.

Since the courts of New York in the Jongebloed and O'Brien cases have held that the appointment of an administrator ad prosequendum is unnecessary, I find that the plaintiff, as general administrator appointed in New York, had the capacity to sue to recover for the death of decedent under the New Jersey Wrongful Death Act.

Accordingly, the motion of the defendant to dismiss the complaint on the grounds that the court lacked jurisdiction of the parties in that there was no diversity of citizenship and that the plaintiff did not have capacity to sue under the New Jersey Wrongful Death Act is denied.

II. Motion as to Interest.

On November 13, 1959 (after trial and verdict), the plaintiff moved for interest on the verdict. He claimed to be entitled to 6% interest on the verdict of $315,000 from the date of death, September 15, 1958, until the jury's ver-

dict, November 12, 1959. He had submitted no request to charge on the subject of interest and had made no mention of the subject until after the jury's verdict. As authority for the claim for interest, plaintiff cited the case of Frasier v. Public Service Interstate Transp. Co., 2 Cir., 1958, 254 F.2d 132, 68 A.L.R.2d 1333.

In that case, Judge Medina stated: "Acting pursuant to this provision, the jury, when assessing damages in a wrongful death action, may include in its verdict interest on that portion of the damages which is awarded for the period from the date of death until the trial, Danskin v. Pennsylvania R. Co., 83 N.J. L. 522, 528–531, 83 A. 1006, 1008–1009, and also discount to its present value any sum awarded to cover prospective earnings of the decedent. Kappel v. Public Service Ry. Co., 105 N.J.L. 264, 144 A. 182; Hackney v. Delaware & A. Tel. & Tel. Co., 69 N.J.L. 335, 55 A. 252." At page 135.

In the Frasier case, 2 Cir., 1958, 254 F.2d 132, the Court of Appeals pointed out that in that case federal jurisdiction was based upon diversity of citizenship, just as it is here, and that the New York conflict of laws rule was applicable. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477. The court further stated: "Under New York law, the award of interest, as well as the award of all damages in a wrongful death action, is controlled by the statute of the place where the injury occurred, and not by the New York statute. Kiefer v. Grand Trunk Ry. Co., 12 App.Div. 28, 42 N.Y.S. 171, affirmed 153 N.Y. 688, 48 N.E. 1105; Maynard v. Eastern Air Lines, Inc., 2 Cir., 178 F.2d 139, 13 A.L.R.2d 646. The New Jersey statute makes no provision for the recovery of interest on the jury's verdict, and there is no New Jersey authority to support such a construction of the statute." At page 135. See also White v. Zutell, D.C.S.D.N.Y.1958, 161 F.Supp. 567.

The failure of a plaintiff to request interest until after the jury's verdict was also commented upon by the court in the Frasier case, 2 Cir., 1958, 254 F. 2d 132: "Accordingly, it is clear that, in the case at bar, no interest could lawfully be compounded on the verdict. It was the sole function of the jury under the New Jersey statute to fix the amount of damages, and any contention urged by the appellee should have been asserted before, or just after the trial judge instructed the jury, or, in the event of some special circumstance such as questions by the jury on the subject, before the conclusion of the deliberations of the jury and the bringing in of their verdict. See Danskin v. Pennsylvania R. Co., supra." At page 135.

The Frasier case, supra, cited a New Jersey case, Danskin v. Pennsylvania R. Co., 83 N.J.L. 522, 528–531, 83 A. 1006, 1008–1009, as authority for the proposition that a jury, when assessing damages in a wrongful death action, may include in its verdict interest on that portion of the damages awarded for the period from the date of the death until the trial. In the Danskin case, however, almost nine years had elapsed from the date of death until the date of trial. The court awarded the plaintiff the deferred payments with interest thereon from the time of the death until the date of trial and then the present value of the sum of the future payments. However, here there was no such lapse from the date of death until the trial. Only a little over one year elapsed and the plaintiff received a preference to obtain an earlier trial.

Plaintiff's motion for interest on the verdict is denied in accordance with the decision in Frasier v. Public Service Interstate Transp. Co., 2 Cir., 1958, 254 F.2d 132, 68 A.L.R.2d 1333.

III. Motion to Set Aside the Verdict and for a New Trial on the Grounds of the Misconduct and Inflammatory Summation of the Plaintiff.

▮▮▮ During the course of the presentation of the evidence before the jury, the defendant made various motions for a mistrial because of certain comments by plaintiff, who served as his own attor-

ney, which defendant claimed to be prejudicial. However, as a matter of fact, none of the comments was important nor prejudicial and such motions were denied, and the jury was instructed to disregard such comments. The plaintiff was appropriately instructed.

Plaintiff in summation—

1. Referred to the Biblical story of Joseph, his father and his brothers, and, among other things, said that the spirit of the decedent, Andrew T. Gill, would be present with the jury in their deliberations.

2. Mentioned the fact that plaintiff's hair had become gray in the course of this law suit supposedly solely by reason of the opposition he had encountered.

3. Recited the claim that his duties as administrator compelled a judicial determination by verdict in this case.

As to these features, it is my opinion that the jury were not influenced by any of the statements or tactics pursued. In certain respects the court, during plaintiff's summation, instructed the jury to disregard plaintiff's comments and instructed plaintiff to adhere to the issues. This court also repeatedly pointed out in the charge that the case must be decided by the evidence of the witnesses and by the exhibits admitted; that the arguments of the lawyers were not evidence and that the case must not be determined on a basis of sympathy.

I have concluded that there is not sufficient ground to grant a retrial because of such happenings.

Consequently, this motion is denied.

IV. Motion as to the Death Verdict.

■ The defendant contends that the verdict of $315,000 for death is excessive. The trial court is, therefore, required to review the evidence and to pass on its sufficiency. As Judge Moore wrote in Alexander v. Nash-Kelvinator Corporation, 2 Cir., 1958, 261 F.2d 187, 191:

"This court is mindful of the principle so frequently reiterated that the question of the excessiveness of a jury verdict is to be determined by the trial court on a motion for a new trial. In such cases the trial court, in effect, occupies the position of a reviewing judge. He has the power to pass upon, set aside or even reduce by remittitur excessive awards. * * *"

Judge Waterman in Dellaripa v. New York, New Haven and Hartford Railroad Company, 2 Cir., 1958, 257 F.2d 733, 735 well said:

"* * * the trial court has the power to set aside the jury's verdict if he believes that it is excessive, but obviously that power must be exercised with due regard for the jury's primary responsibility to fix the amount of the damages. However, responsibility for the amount of damages awarded does not lie exclusively with the jury—its responsibility is primary, but not final. The ultimate responsibility rests with the trial judge who may set a verdict aside. His power to set aside a verdict as excessive implies that he has a duty to do so when he conscientiously believes that the jury has exceeded the bounds of propriety. This duty should not be avoided by hiding behind the jury's verdict. * * *"

See also Fiskratti v. Pennsylvania Railroad Co., D.C.S.D.N.Y.1957, 147 F.Supp. 765.

■ Courts, it is true, have often refused to disturb jury verdicts, even though, if the question had been theirs to decide initially, they would have allowed a different amount. Gallagher v. Lehigh Valley R. Co., D.C.E.D.N.Y.1944, 55 F.Supp. 1022. However, when the sum agreed upon by the jury is so vastly at variance with what common sense and experience dictate to be a fair allowance in the particular circumstances of the case, courts have not hesitated to exercise their discretionary power to modify the verdict in the interest of fairness to all parties. Burris v. American Chicle Co., D.C.E.D.N.Y.1940, 33 F.Supp. 104, affirmed 2 Cir., 1941, 120 F.2d 218; Cunningham v. Pennsylvania R. Co., D.C.E.

D.N.Y.1944, 55 F.Supp. 1012; Bates v. Pan American Bus Lines, Inc., D.C.S.D. N.Y.1941, 42 F.Supp. 213; Mayer v. Gulf Oil Corp., D.C.E.D.N.Y.1941, 36 F. Supp. 773; McMahon v. Pennsylvania R. R. Co., D.C.E.D.N.Y.1938, 24 F.Supp. 154; Bosher v. International Ry. Co., D.C.W.D.N.Y.1926, 15 F.2d 388.

A New Jersey court in finding that a jury award under the New Jersey Wrongful Death Act, N.J.S.A. 2A:31–5, was excessive, commented: "We therefore endeavor to reconcile, if possible, the verdicts in the present cases with the evidence and all reasonable inferences and probabilities which the jury might have drawn from any of the proofs. In cases of this nature in which a jury is permitted to envision from the basic evidence the probabilities of the unknown future, it is not free to make unrestrained and incommensurable awards." Capone v. Norton, Superior Court of New Jersey, Appellate Division, 1952, 21 N.J. Super. 6, 90 A.2d 508, 510.

To attempt to ascertain mathematically the pecuniary value of a life is neither an easy nor a pleasant task. In establishing the value of a human being and estimating the import of the personality of a man or woman, the line of demarcation is not always clear.

▮▮▮ Whether or not it would be difficult for a jury to perform the required mathematical computations,[3] the mandates of the appellate courts in any event appear to require the trial judge in a case such as this to do so upon a review of the amount of the verdict.

### Interest Rates.

▮▮▮ The only testimony in the case concerning the earning power of money and possible rates of discount was from George W. Shelly, an actuary employed by the Equitable Life Assurance Society of the United States, who was called as a witness by the plaintiff. Mr. Shelly testified that he had researched the question of the present value of an annual income in the future. He stated that he was familiar with the fair and reasonable return of money at the present time.

Shelly testified that the interest rate was dependent on the length of time of the investment. He stated: "Right now, for something that would be 30, 40 years in the future, it would seem reasonable to me to assume no more than 3 per cent. (SM 451)

He stated that if the investment were only for five years, that 3½ to 4 per cent might be the reasonable rate of return. Shelly testified that he was familiar with interest rates on government bonds and rates paid by savings banks.

He concluded that keeping in mind the length of time of the investment, the possibility of reinvestment and diversification of the investment, that 3% would be the reasonable rate of interest.

Since this was the only testimony in the case with regard to interest rates, it is reasonable to assume that this was the rate applied by the jury to discount the lump sum payment to its present value.

The Court of Appeals for the Second Circuit has considered the proper rate of discount of an award for prospective earnings in two recent cases. In O'Connor v. United States, 2 Cir., 1959, 269 F. 2d 578 (decided August 10, 1959), Judge Anderson stated:

"The rate is to be determined by the trier. The rule is that there should be applied for such discount the rate which persons without financial skill could safely secure on their investments. Oleck, Text Book on Damages to Persons and Property, 966.25; Chesapeake and Ohio R. Co. v. Kelly, supra [1916, 241 U.S. 485] (Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.); Gulf, Colorado & Santa Fe R. Co. v. Moser, 1927, 275 U.S. 133,

---

3. It is doubtful if a special verdict would be suitable or if it would be practical to present such a case in that method to a

jury. See White v. Zutell, 2 Cir., 1959, 263 F.2d 613, 614, note 1.

48 S.Ct. 49, 72 L.Ed. 200 (same). Although savings institutions have been paying 3¼% and 3½% this court cannot say that any rate between 3% and 4½% is wrong as a matter of law." At page 585.

A period of 34.76 years was involved in that case.

However, in Alexander v. Nash-Kelvinator Corporation, 2 Cir., 1959, 271 F. 2d 524, 527, Judge Moore, in a case where the loss of prospective earnings was stated to be $800 a year, with a life expectancy of 20 years, stated: "No reason is stated for using a 2½ per cent rate. It should not be less than 4 per cent."

Not unmindful of those two cases and fully cognizant of the fact that it is possible to obtain a yield of 4% on United States Government Bonds purchased at this time,[4] the following facts, to wit, that the only testimony in the case emphasized the reasonableness of a 3% return, that the rate is to be that which persons "without financial skill could safely secure," and that it would be impossible to prophesy that the interest rates will be as high in the future as they are today, persuade me that a reasonable man on the jury could very well have concluded that the discount rate to be applied should be 3%. Accordingly, a discount rate of 3% will be employed to find the present value of the prospective pecuniary loss.

### Factors Bearing on Measure of Damages in Death Action.

The recent case of O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578 pointed out the fundamental principles to be considered in the assessment of damages in a death action. It is true that the O'Connor case involved an action under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq. and Oklahoma state law was applicable, but the standards to be applied were the same there as in the present case. The New Jersey Wrongful Death Act is compensatory, as is the Federal Tort Claims Act. In both cases the recovery sought was to compensate for the pecuniary loss occasioned by the death of the decedent.

The Court of Appeals for this circuit pointed out:

1. "The principal considerations in determining what pecuniary loss was sustained by the wife and child of the deceased in this case by reason of his death are the decedent's earning capacity, that is, what he might under all the circumstances reasonably be expected to earn had he remained alive, and the extent to which the wife and child might logically and reasonably have been expected to share in it." O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578, 582.

2. "What the decedent was actually earning at the time of his death is a major factor in determining earning capacity." O'Connor v. United States, supra, at page 582.

3. "It is also proper to consider the length of time he worked for his employer * * *; the prospect of his retaining his job and the opportunities for other employment; his chances for future promotion or demotion, his and his wife's and child's probable life expectancies, his physical condition, habits and the ordinary vicissitudes of life." O'Connor v. United States, supra, at page 582.

4. A fair portion of the household expenses must be attributable to decedent. O'Connor v. United States, 2 Cir., 1958, 251 F.2d 939; Id., 2 Cir., 1959, 269 F.2d 578.

It is clear that the New Jersey courts limit recovery under the New Jersey Wrongful Death Act to the pecuniary loss suffered as a result of the death of the decedent. Carter v. West Jersey & S. R. Co., 1908, 76 N.J.L. 602, 71 A. 253, 19 L.R.A.,N.S., 128; Cooper v. Shore Electric Co., 1899, 63 N.J.L. 558, 44 A. 633; Capone v. Norton, 1952, 21 N.J. Super. 6, 90 A.2d 508.

The deceased's prospective earning capacity is an important factor in assess-

4. New York Times, Tuesday, January 12, 1960 (p. 34).

ing damages. Capone v. Norton, 1952, 21 N.J.Super. 6, 90 A.2d 508.

For other factors considered by the New Jersey courts, see Clark v. Prime, 1940, 12 A.2d 635, 18 N.J.Misc. 226; Clifford v. McCloskey, 1951, 13 N.J. Super. 96, 80 A.2d 134.

The case of McManus v. New Jersey Water Co., 1952, 22 N.J.Super. 253, 91 A.2d 868, indicates that the amount to be considered as a basis in measuring the pecuniary loss should be that amount which the decedent had actually contributed during his lifetime.

In the recent case of Frasier v. Public Service Interstate Transp. Co., 2 Cir., 1957, 244 F.2d 668; Id., 2 Cir., 1958, 254 F.2d 132, 68 A.L.R.2d 1333, the Court of Appeals for this Circuit set forth the factors to be considered by a jury in measuring damages under the New Jersey statute:

"The court properly instructed the jury on the measure of damages—that in measuring damages the following factors could be considered: (1) the loss to the widow in the light of the deceased's life expectancy of 40.17 years at the time of the accident, his widow's expectancy of 41.53 years and his earnings which had been $1,800 in 1948, $2,250 in 1949 and $2,538 in 1950, making allowance for the deceased's own needs; (2) the loss to the three minor children, aged 3½, 1½ and 4 months at the time of the accident, of 'the care and guidance and advice of a father' during their minority; and (3) funeral expenses.

"The measure of damages for wrongful death is determined by the law of the place where the fatal injury occurred. 2 Beale, Conflict of Laws, § 412.2. While the New Jersey Statute (Revised Statutes N.J. § 2:47–4, 5) limits recovery to those pecuniary injuries resulting from death, the New Jersey courts have given 'pecuniary injuries' a broader meaning than the one urged by the appellant. They are not to be limited to the loss of earnings but include the loss of a 'mother's nurture,' the intellectual, moral and physical training and instruction of children. McStay v. Przychocki, 1950, 9 N.J. Super. 365, 370, 74 A.2d 370, 372, affirmed 1951, 7 N.J. 456, 81 A.2d 761; Clark v. Prime, 1940, 12 A.2d 635, 636, 18 N.J.Misc. 226.

"By the same token the loss of the 'care and guidance and advice of a father' is a pecuniary injury to his children during their minority.

"As to the deceased's earnings, the jury may consider probable prospective earning capacity. Capone v. Norton, 1952, 21 N.J.Super. 6, 90 A.2d 508, 510; Clifford v. McCloskey, 1951, 13 N.J.Super. 96, 80 A.2d 134, 135. * * *" 244 F.2d at pages 669–670.

### Life Expectancy and Work Expectancy of the Decedent.

Based upon the United States Life Tables, compiled by the Census Bureau, the life expectancy of the decedent (39 years of age at death) was 32.06 years. (Shelly, actuary, SM 436)

On June 3, 1958, the decedent was examined as an applicant for life insurance. This examination appears to have indicated that he was in a sound condition of health. As a result, he was accepted under a seven year term policy in the amount of $25,000. (Plaintiff's Exhibit 6) Shelly, of the Equitable Life Assurance Society, testified that the issuance of this policy meant that the decedent was not only physically examined, but was "inspected for health, morals, habits and he was put in the standard class for insurance." (SM 437)

Shelly went on to state that for such persons who so pass such an examination the established experience of insurance companies on policies totalling slightly under $170,000,000,000 of insurance would result in a greater life expectancy than ordinary (32.06 years), to wit, 34.85 years. (SM 436–445) Accordingly, I believe it proper to adopt 34.85 years as the probable life, and, I

believe, work expectancy of the decedent had he lived. The discount factor, Shelly said, for that period at 3% would be 21.43. (SM 449; see also Table, Exhibit 31) As previously stated and for the reasons stated, I have adopted a 3% rate.

### The Income of the Decedent.

██ The decedent, a New Jersey resident, was a lawyer, born on May 11, 1919, and, hence, 39 years of age on September 15, 1958, the date of death. He was in good health, having recently, as heretofore stated, passed an examination for an insurance policy. (Plaintiff's Exhibit 6) He left a widow, then 36 years old, and five minor children, hereinafter mentioned. For a time, 1945–1952, he was employed in the United States Internal Revenue Service. During the latter part of this period he studied law and graduated from Fordham Law School in June 1953. In 1952, he had commenced work with the firm of Davis, Wagner, Hallett and Russell as an employee and remained with that firm after admission to the New York Bar in 1954 until death. During such employment decedent received fees from certain other practice, mostly relative to pension trust matters.

The annual income of decedent commencing in 1954 was approximately as follows:

| | |
|---|---|
| 1954 | $ 7,700 |
| 1955 | $ 7,400 |
| 1956 | $11,400 |
| 1957 | $ 9,100 |
| 1958 (8½ months) | $ 8,000 |

Of the above amounts the total annual salary from the law firm by whom decedent was employed for the same years was as follows:

| | |
|---|---|
| 1954 | $7,009 |
| 1955 | $7,224 |
| 1956 | $7,224 |
| 1957 | $7,224 |
| 1958 (8½ months) | $4,696 |

Extra compensation or income which he received from other practice (mostly pension fund cases) was substantially as follows:

| | |
|---|---|
| 1954 | none |
| 1955 | $ 116 |
| 1956 | $ 83 |
| 1957 | $1,926 |
| 1958 (8½ months) | $1,800 |

His salary as shown for the three full years prior to death was $7,224 annually, with a take-home pay of $105 weekly. For the pension fund cases he at first received one-third of the fees and the firm two-thirds. Starting in 1957, however, the firm, rather than increasing his salary, allotted him three quarters of the fees on the cases he brought in.

The extra fees above mentioned apparently came largely, if not entirely, through Richard Griffin, Vice President of Wichenden & Associates, pension consultants. Richard Griffin was an attorney who apparently operated a consultation service for pension fund plans. It does not appear affirmatively from the record that the decedent was acquiring any other type of practice. Whether this source of practice would have continued or increased is not determinable. Moreover, fees coming from this source were first split half and half with Mr. Griffin.

There was little, if any, testimony to indicate a probable increase in the decedent's income. That was left solely to plaintiff's argument that the decedent was capable, that he had a good work record in the United States Internal Revenue Service, was of good health and would, therefore, have continued to increase his income. After the verdict, on argument, when plaintiff was asked what this meant, he said, in effect, up to $25,000.

No witnesses were called to show the capability of decedent as a lawyer. None of the members of the firm for which he had worked testified as to his probable advancement, if he had lived. No authority was called to demonstrate whatever reasonably probable progress the decedent as a lawyer might have made.

While the deceased's prospects of advancement may be taken into account (see Briscoe v. United States, 2 Cir., 1933, 65 F.2d 404) the jury may not

speculate as to the increased future earnings. See Hirschkovitz v. Pennsylvania R. Co., C.C.S.D.N.Y.1905, 138 F. 438. "This court is of the opinion that the verdicts of juries in this class of cases as to damages should be based on facts shown by evidence, and not on guesses or speculation or conjecture." At page 440. See also Middleton v. Luckenbach S. S. Co., Inc., 2 Cir., 1934, 70 F.2d 326; De Vito v. United Air Lines, D.C.E.D.N.Y.1951, 98 F.Supp. 88; Rogow v. United States, D.C.S.D.N.Y.1959, 173 F.Supp. 547; Cromley v. Speich, D.C.M.D.Pa. 1937, 19 F.Supp. 857, affirmed 3 Cir., 1938, 94 F.2d 543; Capone v. Norton, 1952, 21 N.J.Super. 6, 90 A.2d 508.

### Income Tax Deductions.

The testimony in this case elicited voluntarily from Mrs. Gill, widow of the decedent, definitely stated that her husband out of a weekly salary of $126 had a take-home pay of $105, and of this she received $90 and her husband kept $15.

Defendant's request to charge No. 10 was as follows:

"10. In arriving at the contributions which the wife and children might reasonably have expected herein, you must consider that there would be deducted from the gross earnings of the decedent which would not be available to the wife and children, income taxes. You must also consider in arriving at the contributions of the decedent to the wife and children that the decedent must necessarily have incurred some expenses for himself during his lifetime, such as commutation, clothing, meals, and personal entertainment expenses. In considering the earnings of the decedent as bearing upon the contributions which he would have made, you should consider only his take-home pay."

After considerable colloquy and argument (see SM 629–31, 642–652), the court ruled as follows:

"I am going to refuse No. 10, and I do it upon the ground that it appears to me that the O'Connor case relates to a tort claim, a Federal tort claim, and it comes up from Oklahoma, and that it is not necessarily the law of New Jersey, and that I still would be compelled to charge that the basis from which the benefits to the wife and children may be obtained are those which the plaintiff's decedent would have had. You have in evidence certain things, and I suppose you can argue about it, but I am not granting the first sentence. I am refusing the first sentence in No. 10. I am refusing the last sentence in No. 10. I am granting as charged the second sentence." Pp. 655–56.

In accordance with this direction and ruling, defendant's counsel in summation, among other things, stated as follows:

At page 685 of the trial minutes, second full paragraph: "Now from the gross figure, of course, has to come off the income tax, his personal expenses, his clothing and his commutation, his meals, whatever entertainment he had, cigarettes and so forth."

Further statements of similar character in defendant's summation are shown in the note below.[5]

At page 678, line 2: "$15 a week added to the $90 a week to make it $105 take-home pay, I submit, would not be enough for Mr. Gill to come to New York and to pursue his job * * *."

At page 675, line 8: "* * * the basic salary was a take-home pay of $105 a week."

At page 674, line 16: "The only testimony brought out was the testimony * * * that he had a take-home pay,

---

5. At page 677, line 19: "* * * as the gross earnings are not available for family use, are not available for personal use. There are deductions for income tax; there are commutation expenses; * * *"

At page 686, top of page: "But if you take any of these figures you will see that $90 a week contribution, when you consider the fact that there was commutation and other items I have mentioned, is not far from the fact here under any circumstances which you have."

Plaintiff, in summation, did not seriously attempt to counter this argument.

Thus, although the court refused to adopt the explicit direction to deduct income taxes in obtaining the amount available for contribution to the wife and children, the implications were clear. No decisions of the New Jersey courts on this specific issue were found by court or counsel.

In the charge to the jury I stated: "The pecuniary injuries sustained by the wife and children in this action are determined by the pecuniary contributions which the decedent made to them during his lifetime, and which could reasonably and logically be expected to continue from him had he continued to live." (SM 741)

I also said: "In considering the future contributions which the decedent might have made had he continued to live, you must consider the testimony in this case and the exhibits * * *." (SM 741) The exhibits included the 1956 tax return (Plaintiff's Exhibit 15). And, again: "Consideration should be given to that amount which *actually would have been received* by the wife and children if the decedent had lived and continued to work, based upon all the evidence in the case." (SM 743)

It is true that in a recent federal court decision, Jennings v. United States, D. C.D.Md., 1959, 178 F.Supp. 516, 532, Judge R. Dorsey Watkins stated:

"The Government contends that the amount available to Stewart and his family for all purposes was the net amount after taxes; and therefore the awards to the widow and

children should be reduced by similar amounts. Support for this is found in O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578, 583, 584. It was not mentioned by the Fourth Circuit in the Guyer case [United States v. Guyer, 4 Cir., 218 F.2d 266]. It is apparently against the weight of authority. Gregory & Halven, Cases and Materials on Torts, p. 468 (1959); 2 Harper & James, Torts, § 25.16 (1956); Annotation: 'Propriety of taking income tax into consideration in fixing damages in personal injury or death action' 63 A.L.R.2d 1393; 16 NACCA Law Journal 212; 32 Nebraska Law Review 491 (1953); 8 Arkansas Law Review 174 (1954); 51 Colum.L.Rev. 782 (1951); and see also Nordstrom, Income Taxes and Personal Injury Awards, 19 Ohio St.L.J. 212 (1958); Jolowicz, Damages and Income Tax, 17 Camb. L.J. 86 (1959)."

However, I have now come to the conclusion that although there are no New Jersey decisions on this point, I must be guided by the decision of this circuit in O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578, 583, 584 in my consideration of the motion addressed to the excessiveness of the verdict. Realities must prevail.

Accordingly, in this review of the reasonableness of the verdict, I am adopting the principle of O'Connor.[6]

### The Probable Future Income of Decedent Had He Lived.

 In 1954 the net income before income taxes of one-third of all

---

Mr. Gill, of $105 a week, of which he gave her $90 a week."

.At page 678, line 10: Mr. Allen refers to Mr. Gill's income tax returns.

At page 679, third full paragraph: "Of course the sum which you will award for the pecuniary injuries, for the loss of contributions which are no longer here, that sum must be such as could reasonably and logically be expected to make up for that loss over the expected lifetime of Mr. Gill, over the period of time that he would have continued to work and

would have brought home his take-home pay of $105, and then the $90, or whatever the figure is; * * *"

At page 685, line 3: Mr. Allen again refers to "take-home pay."

6. The plaintiff in a brief after trial indicates that on the basis of the 1956 income tax actually paid by the decedent, the present value of this factor if applied to 34.85 years and discounted would be "only some $18,000."

practicing lawyers was less than $5,485.[7] In 1954 the income of lawyers in New York for the median was $8,470, and for the mean, $11,755.[8]

The average net income of lawyers under various age levels, insofar as the same is pertinent here, is as follows:[9]

| Age Group | All Lawyers | | Salaried Lawyers | |
|---|---|---|---|---|
| | Mean [a] | Median [b] | Mean | Median |
| 40–44 | $11,356 | $ 9,371 | $11,310 | $9,726 |
| 45–49 | 12,152 | 9,496 | 12,323 | 9,974 |
| 50–54 | 12,844 | 9,728 | 13,308 | 10,562 |
| 55–59 | 12,874 | 9,366 | 13,183 | 10,288 |
| 60–64 | 12,193 | 8,897 | 12,686 | 10,194 |
| 65 and over | 9,046 | 6,474 | 11,174 | 9,600 |
| All lawyers | 10,218 | 7,833 | 10,068 | 8,229 |

(a) Mean income is arrived at by dividing total income by the number of income recipients.

(b) Median income is that income which represents the middle amount, i. e., half the income recipients fall above and half fall below the median income.

---

A survey of the mean and median net income of lawyers by the number of years in practice as of 1954 shows the following results:[10]

| Years of Practice | All Lawyers | | Salaried Lawyers | |
|---|---|---|---|---|
| | Mean | Median | Mean | Median |
| 5–9 years | $ 7,688 | $ 7,020 | $ 7,742 | $ 7,193 |
| 10–14 years | 9,741 | 8,706 | 10,006 | 9,010 |
| 15–19 years | 11,676 | 9,775 | 11,692 | 10,167 |
| 20–24 years | 12,118 | 9,863 | 12,530 | 10,488 |
| 25–29 years | 13,181 | 9,839 | 13,591 | 10,375 |

---

The average net income of lawyers in all kinds of practice in 1954 was $10,220.[11]

In 1953, 85% of all sole practitioners had a net income of under $10,000.[12]

See Income of Lawyers in the Post War Period, Survey of Current Business, December 1956. See also American Bar Association Journal, September 1957, A New Look: The Economics of the Profession by Robert M. Segal.

The studies on which the foregoing statistics are based are properly subject, I believe, to the doctrine of judicial no-

7. See Lawyers' Economic Problems, The Economic Dilemma of the American Lawyer, prepared for the American Bar Association by Sub-Committee on Economics of Law Practice, p. 2.

8. Ibid, p. 8.

9. See Table 13, Income of Lawyers in the Postwar Period by Maurice Liebenberg, Survey of Current Business, December 1956.

10. See Table 16, Income of Lawyers in the Postwar Period by Maurice Liebenberg, Survey of Current Business, December 1956.

11. American Bar Foundation, Lawyers in the United States: Distribution and Income, Part Two: Income, p. 13.

12. American Bar Foundation, Lawyers in the United States: Distribution and Income, Part Two: Income, p. 23.

tice. Hunter v. New York, O. & W. R. R. Co., 1889, 116 N.Y. 615, 621, 23 N. E. 9, 6 L.R.A. 246 [general rule]; Cox v. Polson Logging Co., 1943, 18 Wash. 2d 49, 138 P.2d 169, 176 [standard mortality tables]; Groves v. Board of Com'rs of Lake County, 1936, 209 Ind. 371, 199 N.E. 137 [census]; Whyte v. Industrial Commission, 1951, 71 Ariz. 338, 227 P. 2d 230 [wage trends]; State v. Hampton Water Works Co., 1941, 91 N.H. 278, 18 A.2d 765, 19 A.2d 435 [investment trends].

Calculations based on the age of the lawyer and those based on years of his practice, based on the foregoing tables, appear as follows: (Note: Decedent was 39 years of age at death and had practiced law approximately 5 years.)

| Age of Lawyer | Table (Mean) | Rounded Figure | Median | Rounded Figure |
|---|---|---|---|---|
| 40–44 | $11,356 | $11,500 | $ 9,371 | $ 9,500 |
| 45–49 | 12,152 | 12,000 | 9,496 | 9,500 |
| 50–54 | 12,844 | 13,000 | 9,728 | 10,000 |
| 55–59 | 12,874 | 13,000 | 9,366 | 9,500 |
| 60–64 | 12,193 | 12,000 | 8,897 | 9,000 |
| 65 & over | 9,046 | 9,000 | 6,474 | 6,500 |

| Years of Practice (Age of Decedent) | Table (Mean) | Rounded Figure | Median | Rounded Figure |
|---|---|---|---|---|
| 5–9 (40–44) | $ 7,688 | $ 8,000 | $ 7,020 | $ 7,000 |
| 10–14 (45–49) | 9,741 | 10,000 | 8,706 | 9,000 |
| 15–19 (50–54) | 11,676 | 12,000 | 9,775 | 10,000 |
| 20–24 (55–59) | 12,118 | 12,000 | 9,863 | 10,000 |
| 25–29 (60–64) | 13,181 | 13,000 | 9,839 | 10,000 |

The *average* or *mean* from the last two tables would produce the following results:

| By Age | | By Years of Practice | Average |
|---|---|---|---|
| 40–44— | $11,500 | $ 8,000 | $ 9,750 |
| 45–49 | 12,000 | 10,000 | 11,000 |
| 50–54 | 13,000 | 12,000 | 12,500 |
| 55–59 | 13,000 | 12,000 | 12,500 |
| 60–64 | 12,000 | 13,000 | 12,500 |

But the use of *median* for the same two computations produces this result:

| By Age | | By Years of Practice | Average |
|---|---|---|---|
| 40–44— | $ 9,500 | $ 7,000 | $ 8,250 |
| 45–49 | 9,500 | 9,000 | 9,250 |
| 50–54 | 10,000 | 10,000 | 10,000 |

| By Age | | By Years of Practice | Average |
|---|---|---|---|
| 55–59 | $9,500 | $10,000 | $9,750 |
| 60–64 | 9,000 | 10,000 | 9,500 |
| 65 & over | 6,500 | — | — |

There was nothing in the proof to indicate affirmatively that the decedent was destined to earn more than the mean. He had entered the practice of law at approximately 34 or 35 years of age. He had acquired no independent clientele. His salary with the firm was not large and the firm had indicated, in effect, that if he made more than $7,224 he would have to make it on his own business. Moreover, the pension trust practice he had was from a single source,

In view of all the circumstances, therefore, it is my belief that the proof does not warrant any higher income (for the 33 remaining years after date of verdict) than the following:

Table 1

| Age | Years | Income | Adjusted to 1959 Dollar [a] | Total for Period |
|---|---|---|---|---|
| 41–44 | 1959–1963 | $11,500 | $12,305 x 4 equals | $ 49,220 |
| 45–49 | 1964–1968 | 12,000 | 12,840 x 5 equals | 64,200 |
| 50–54 | 1969–1973 | 13,000 | 13,910 x 5 equals | 69,550 |
| 55–59 | 1974–1978 | 13,000 | 13,910 x 5 equals | 69,550 |
| 60–64 | 1979–1983 | 12,000 | 12,840 x 5 equals | 64,200 |
| 65–73 | 1984–1992 | 9,000 | 9,630 x 8 equals | 77,040 |

Total for Period ......... $393,760

Thus, the average for the 33-year period is ......... $ 11,932

(a) Adjusted by reference to Cost of Living Index (between first part of 1954 and the early part of 1959) equals increase of 7% plus. Labor Department Index, January 31, 1954—115.2, and January 31, 1959—123.8.

———◆———

### Pecuniary Benefits to Wife and Children.

#### (a) *Contributions to family*

It is self-evident that the decedent could not contribute more to his family than the total of his net earnings less expenses necessary to create such income and to sustain himself.

In ascertaining what amount was available to decedent for his family by way of contribution, we have certain statistical information:

1. I have already stated that in my judgment a fair estimate of the decedent's income, if he had lived, would have been $12,305 (as adjusted) for the period 1959–1963.

2. The last reliable source [13] of information of decedent's actual income is the 1956 Income Tax Return, which shows an adjusted gross income of $11,323, which included $365 in capital gains (from the sale of stock in the Squared Circle System Inc.) (See 1956 return, Plaintiff's Exhibit 15)

3. From the 1956 deductions claimed (Plaintiff's Exhibit 15), it would seem

13. Decedent secured an extension for filing his 1957 return; had not filed that return before death; his widow filed an original return for $9,100 and during the trial executed an amended return showing an adjusted gross return of $11,191.-

34. However, since the amended return, as to the additional income, was based upon insufficient evidence, the court did not admit this as proof of additional income.

fair to assume that during the lifetime of decedent, at least for some time to come from 1958, he would have had **the** following expenses, among others:

a. Contributions to church and charities .............. $ 225
b. Interest on mortgage (Northfield Savings & Loan Association, $522) on a diminishing basis .............. 300
c. Real estate taxes (on house) ...................... 321
d. Bureau of Motor Vehicles ........................ 29
e. City sales and gas, etc. taxes ...................... 150
f. Medical, dental, medicines and drugs and hospitalization ............................. $1,130

Deducting a fair allowance for the expense<br>
of maternity (included in item of $1,130)—<br>
Items $125<br>
15<br>
49<br>
167 ...... 356 774

g. Legal fees paid out ........................ $ 125
 Secretarial services ........................ 75
 Miscellaneous ............................. 550

Allowed ............... 750

Total of Such Expenses ........$ 2,549

---

Now, if the Federal income tax is<br>
computed on the 1956, 1957 or 1958 rates,<br>
we have the following calculations:

Adjusted gross income (determined as above) .......... $12,305
Deductions as above estimated ................... 2,549
Balance ........................................ $ 9,756
Deduct 7 exemptions at $600 each ................. $ 4,200

Taxable Income ................ $ 5,556

The tax on $5,556 is ............................... $ 1,142.[14]

---

14. 20% of $4,000 is $800; 22% of $1,556 is $342 (under joint return).

Thus, disregarding for the moment the benefits to the wife and children contained in the item of $2,549 (deductions above mentioned and before deduction of the amount attributable to the decedent's own expenses) we may continue our calculation as follows:

### Table 2

| | | |
|---|---:|---:|
| Total income ........................................ | | $12,305 |
| Deductions as above set forth ...... | $2,549 [15] | |
| Income tax ...................... | 1,142 | ...... $ 3,691 |
| Net available for total family expenditure ........................ | | $ 8,614 |

*Add* benefits to family included in the $2,549 deduction above mentioned:

| | | |
|---|---:|---:|
| Interest on mortgage .............. | $ 300 | |
| Real estate tax on home ............ | 321 | |
| Motor vehicle tax ................. | 29 | |
| Sales and gas tax ............... | 150 | |
| Medical, etc. ..................... | 774 | |
| Total of such benefits ....................... | | $ 1,574 |

Thus, the total available for family and decedent was ......$10,188

------♦------

### Decedent's Personal Expenses.

█ It is elementary that decedent's personal expenses and a fair allocation of the usual family expenses for decedent's living must be deducted before arriving at the amount available for the wife and children.

Certain determinations made by courts in other cases may be helpful.

In O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578, a wife and a son survived. The court decided that two-thirds was the maximum which could be allocated to the support of the wife and son (at page 583) but only one-half to the wife after the son became of age. The child was seven years of age. O'Connor v. United States, 2 Cir., 1958, 251 F.2d 939, 942.

In Rogow v. United States, D.C.S.D. N.Y.1959, 173 F.Supp. 547, 560, Judge Kaufman, in a case involving a widow and two children of the ages of 3 and 5 surviving, attributed to the husband an expense of $3,000 out of a net income after taxes of $13,806. This charges or credits approximately 23% to the husband.

In Jennings v. United States, D.C.D. Md., 1959, 178 F.Supp. 516, Judge Watkins, in a case in which four children survived, allocated $1,500 out of the total fixed income of $8,460 to the husband and $6,960 to the wife and children. (This ratio, therefore, is approximately 18% allocable to the husband and the balance to the wife and four children.)

The only testimony relative to the decedent's personal expenses (i. e., *outside* of the expenses of the household) was by Mrs. Gill, who said that out of the weekly take-home pay of $105, Mr. Gill kept $15 for his commuting expenses to New York City from Rumson, New Jersey, and gave the balance to his wife. The commutation rate on the railroad was $31 monthly. Although his personal expenses were probably at least $780 a year, I am deducting only $40 a month for commutation expenses. Mr. Gill's other expenses are included in his allo-

15. I have disregarded the decedent's annual life insurance premiums of $325.74 on his policy of $25,000 (Plaintiff's Exhibit 6) because it is payable to the wife, or, in the event of her death, to the children, and since the policy runs for seven years only.

cation of the household expenses hereinafter mentioned.

The total amount available for decedent and family as above estimated was ........ $10,188. It is fair to deduct decedent's commuting expenses ........ $ 480. Subsequently, we have remaining for general household expenses .................... $ 9,708.

Apportionment of this amount ($9,708) equitably between husband and family must vary with the number of children then under the parental roof or reasonably within the expectancy of the father's financial contributions.

Based upon the foregoing, the following is my estimate of the portion attributable to the decedent during the respective periods of minorities:

Table 3

| Dates | Number of Years of Minority | Number of Minors | Husband | Wife and Children |
|---|---|---|---|---|
| 1959–1971 | 12 | 5 | ⅙ | ⅚ |
| 1972 | 1 | 4 | ⅕ | ⅘ |
| 1973 | 1 | 3 | ¼ | ¾ |
| 1974 | 1 | 2 | ⅓ | ⅔ |
| 1975–1977 | 3 | 1 | ⅓ | ⅔ |
| 1978–1992 | 15 | 0 | ½ | ½ |

Award for Period from September 15, 1958 to Date of Verdict (November 12, 1959), Including Interest.

■ Although the plaintiff's motion with respect to interest on the verdict was denied by virtue of the reasoning previously stated, interest on that portion of the damages awarded for the period from the date of death until the trial may be included by the jury when assessing damages. Danskin v. Pennsylvania R. Co., 83 N.J.L. 522, 528–531, 83 A. 1006, 1008–1009.

In this case the period from the date of death, September 15, 1958 until the jury verdict, November 12, 1959, was just short of fourteen months.

Since this period has elapsed and the beneficiaries of the decedent have been deprived of the pecuniary benefits of his contributions for this period, it would be unfair to include the sum given for this period in the amount which is discounted to its present value.

For this period, September 15, 1958 to November 12, 1959, in determining the maximum limit, I would find the following damages:

1. Contribution to wife and children
 Estimated annual income .................. $12,305
 Available after tax and other deductions (as hereinafter computed) ....................... 10,188
 ⅚ths allocation to wife and children (of $10,188) .................................... 8,490
 
 Adjusted to the period of 14 months ............ $ 9,905

2. Loss of care, guidance and advice of father—5 children for 14 months—$1,200 per child per year ............ $ 7,000

3. Wife's loss of aid (see discussion hereinafter) ...... —

 Total .................. $16,905
 Interest Thereon at 3% for 14 Months ............. $ 591
 Total for This Factor .. $17,496

The future period of time (after date of verdict) for which prospective contributions of the decedent and other allowances are to be computed will, accordingly, be decreased by the 14 months (for which payment with interest has already been provided). The future period remaining is then approximately 33 years.

Thus, the contribution losses of the wife and children for the 33 year period after the date of verdict are as follows:

Table 4

| Dates | Income (a) | Total Amt. Available (b) | Approx. Ratio (c) | Amount Available to Wife & Children | Number of Years | Total for Period |
|---|---|---|---|---|---|---|
| 1959–63 | $12,305 | $10,188 | 5/6 | $8,490 | 5 | $42,450 |
| 1964–68 | 12,840 | 10,605 | 5/6 | 8,837 | 5 | 44,185 |
| 1969–71 | 13,910 | 11,440 | 5/6 | 9,534 | 3 | 28,602 |
| 1972 | 13,910 | 11,308 | 4/5 | 9,046 | 1 | 9,046 |
| 1973 | 13,910 | 11,176 | 3/4 | 8,382 | 1 | 8,382 |
| 1974 | 13,910 | 11,044 | 2/3 | 7,360 | 1 | 7,360 |
| 1975–77 | 13,910 | 10,912 | 2/3 | 7,275 | 3 | 21,825 |
| 1978 | 13,910 | 10,780 | 1/2 | 5,390 | 1 | 5,390 |
| 1979–83 | 12,840 | 9,945 | 1/2 | 4,973 | 5 | 24,865 |
| 1984–92 | 9,630 | 7,442 | 1/2 | 3,721 | 8 | 29,763 |

The Total for the 33 Year Period Before Discount .........$221,868

The Average for the 33 Year Period Before Discount is ......$ 6,723

(a) See Table 1 hereinbefore.

(b) See Table 2 computed hereinbefore.

(c) See Table 3 hereinbefore.

$221,868 when discounted for a 33 year period at the average amount of $6,723 annually at 3% with a factor of 20.766 is ..........$139,610.

---

(b) Loss to Children—Care and Guidance and Advice of a Father During Minority (Nurture, Guidance and Training).

Under the laws of New Jersey, the loss of the "care and guidance and advice of a father" is a pecuniary injury to his children during their minority. Frasier v. Public Service Interstate Transp. Co., 2 Cir., 1957, 244 F.2d 668, 670; McStay v. Przychocki, 1950, 9 N.J. Super. 365, 74 A.2d 370, affirmed 10 N.J. Super. 455, 77 A.2d 276; Clark v. Prime, 1940, 12 A.2d 635, 18 N.J.Misc. 226 [loss of nurture and physical training and instruction of a mother].

As stated by Judge Kaufman of this court in Rogow v. United States, D.C.S. D.N.Y.1959, 173 F.Supp. 547, 561:

" * * * The loss of the care and guidance and advice of a father is a pecuniary injury to his children during their minority.

" 'The deprivation [of intellectual, moral and physical training] is such as to admit of definite valuation, if there be evidence of the fitness of the parent, and that the child has been actually deprived of such advantages.' Michigan Central R. Co. v. Vreeland, 1913, 227 U.S. 59, 73, 33 S.Ct. 192, 197, 57 L.Ed. 417."

The children of decedent, their names, birth dates, ages and periods to commencement of college years (age 18) were as follows:

| Names | Birth Dates | Age at Death of Father | Age at Time of Verdict | To College Years |
|---|---|---|---|---|
| Andrew | March 26, 1950 | 8 | 9 plus | 9 plus |
| Christopher | May 17, 1951 | 7 | 8 plus | 10 plus |
| Bernadette | May 9, 1952 | 6 | 7 plus | 11 plus |
| Deborah | June 16, 1953 | 5 | 6 plus | 12 plus |
| Jacqueline | December 13, 1956 | 2 | 3 plus | 15 plus |

The testimony of Mrs. Gill as to this feature was substantially as follows: The decedent had an unusually close relationship to the children. (SM 380) He chose the school for the children and registered them. (SM 380–81) He was concerned about their marks (SM 381) and supervised their lessons. (SM 383) He spoke to them at night or at breakfast time about their problems. He brought home vitamins. (SM 381) He took the children to their doctors for physical examinations and was interested in sports for the boys. He took the children to museums and the zoo and on fishing trips. He went to church with them on Sunday. (SM 382) He played with the children and taught the boys baseball. He was a loving father. (SM 383)

In Rogow v. United States, D.C.S.D. N.Y.1959, 173 F.Supp. 547, each child (then 3 and 5 years of age) was allowed $20,000 (which apparently amounts to an average of $1,420 per child per year to 18 years of age). However, Judge Kaufman emphasized that the decedent had been a successful writer of scripts for television and commercial productions, was "tops," had written for many well-known magazines, was a most devoted father, a born pedagogue who taught the children all the time; in short, as Judge Kaufman said:

"Mr. Rogow was a well educated man of considerable intellectual achievement. He was obviously well equipped to provide his children with training and guidance of educational value to them. Such close personal tutelage from a man of Rogow's abilities would have considerable pecuniary value. The children were both very young at the time of their father's death. Had he lived they would have received the benefit of his training and guidance for many years. Indeed, its value would probably have increased as they matured and began to approach their respective careers." At page 562.

In the present case, it is my opinion that the proof is not so weighty. There is not too much evidence as to frequency in certain aspects or as to its likelihood of continuance. See O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578.

Under the facts and circumstances here, I would estimate that the sum of $1,200 per child per year (from date of verdict, November 12, 1959) to 18 years of age, the pre-college period, is adequate. This, therefore, would result as follows:

| Name | Years | Before Discount | Factor at 3% | Discounted Amount |
|------|-------|-----------------|--------------|-------------------|
| Andrew | 9 plus years x $1,200 | $10,800 | 7.786 | $ 9,343.20 |
| Christopher | 10 plus years x $1,200 | 12,000 | 8.530 | 10,236.00 |
| Bernadette | 11 plus years x $1,200 | 13,200 | 9.253 | 11,103.60 |
| Deborah | 12 plus years x $1,200 | 14,400 | 9.954 | 11,944.80 |
| Jacqueline | 15 plus years x $1,200 | 18,000 | 11.938 | 14,325.60 |

The Total Before Discount Is ....$68,400

The Total After Discount Is ..........................$56,953.20

---

**(c) Loss to Widow as to Aid and Assistance and Services.**

▮▮ What sum should fairly be allowed for aid and assistance and services lost by the widow? The testimony on this is most meager. Mrs. Gill testified that her husband assisted her "completely" and that she went to him and he helped her with her problems and handled the sale of their Staten Island house and the purchase of the New Jersey home.[16] (SM 384)

With such a paucity of proof, this court is unable to see how such facts can be translated into monetary or pecuniary loss. Consequently, nothing should be awarded for this factor since plaintiff has not sustained his burden of proving such damage. Apparently this proof to prevail must be more than "sketchy." See O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578, 584.

**Tax Credit.**

▮▮ In determining the pecuniary loss resulting from the death of the decedent, the amount of income tax paid by the decedent was deducted from his salary in accordance with the attempt to place Mrs. Gill and the children in the same pecuniary position they would have been in if the death had not occurred.

Since the basic theory of damages is reimbursement, it would be manifestly unfair to award those who have suffered a pecuniary loss because of defendant's acts an equivalent less than the amount of such pecuniary loss incurred. By the same token by which the actual amount, and only that, is the measurement of loss, so the compensation should be based upon an equal benefit to the family of decedent.

It is reasonably certain that the amount of this award itself will not be taxable. See Revenue Ruling 54–19; 1954 Cum.Bull. 179. That ruling provided that the amount receivable in settlement of claims under the New Jersey "Death by Wrongful Act" statute is not includible in the decedent's gross estate for federal estate tax purposes, nor is that sum taxable as income to decedent's estate or to the dependents who receive the proceeds of the recovery. The ruling stated: "Section 22(a) of the Internal Revenue Code [26 U.S.C.A. § 22(a)] provides that all gains, profits, and income derived from any source whatever are income subject to taxation. Proceeds of this nature, that is, compensation for loss of life, are not embraced in the general concept of the term 'income.' " (P. 180) See also I.T. 2420, Cum.Bull. VII–2, 123.

However, this non-taxability applies to the award itself, not necessarily to any income earned as a result of the investment of the award. Although the total value of the decedent's contribution for 33 years was reduced to a figure which represents the present worth of that sum, there is no indication that the interest on the award which represents the discounted amount will not be subject to taxa-

---

16. The decedent was a lawyer.

tion. Neither party disputes the contention that the percentage of the total amount received over the period of 33 years which represents interest on the award will be taxable. It is, of course, impossible to determine with exactness the future tax rate, but just as it was necessary to face the reasonably probable realities in determining the future income tax to be paid by Mr. Gill, so must such realities be considered here. It would appear that plaintiff is entitled to a so-called "indubitable equivalent" of the loss sustained as far as may be reasonably estimated. The following tax credit obviously does not attempt to decide the future tax on income of this type but is merely an estimate to be used for the purpose of determining this motion.

In ascertaining probable tax liability for payments, a portion of which represents return of capital and the remainder interest on the capital investment, an exclusion ratio is determined. Internal Revenue Code, 1954, 26 U.S.C.A. §§ 72 (a), (b), (c); Federal Tax Regulations, 1959, § 1.72–4 et seq., U.S.Code Cong. and Admin. News, page 89 et seq. This exclusion ratio constitutes the percentage of each payment which is to be considered a repayment of principal and is excluded from gross income.

To ascertain this ratio it is first necessary to find the sum total of the decedent's pecuniary contributions for the 33 year period. This total is as follows:

Credit for Taxes Paid on Award

Table 5

| Dates | Annual Contribution by Decedent to Wife and Children (See Table 4) | Number of Minors | Additional Annual Contribution for Guidance, etc. | Total Annual Contribution for Period | No. of Years (See Table 4) | Total |
|---|---|---|---|---|---|---|
| 1959–63 | $8,490 | 5 | $6,000 | $14,490 | 5 | $ 72,450 |
| 1964–68 | 8,837 | 5 | 6,000 | 14,837 | 5 | 74,185 |
| 1969–71 | 9,534 | 5 | 6,000 | 15,534 | 3 | 46,602 |
| 1972 | 9,046 | 4 | 4,800 | 13,846 | 1 | 13,846 |
| 1973 | 8,382 | 3 | 3,600 | 11,982 | 1 | 11,982 |
| 1974 | 7,360 | 2 | 2,400 | 9,760 | 1 | 9,760 |
| 1975–77 | 7,275 | 1 | 1,200 | 8,475 | 3 | 25,425 |
| 1978 | 5,390 | — | — | 5,390 | 1 | 5,390 |
| 1979–83 | 4,973 | — | — | 4,973 | 5 | 24,865 |
| 1984–92 | 3,721 | — | — | 3,721 | 8 | 29,768 |

Total Payments for 33 Years
(Not Discounted) ................$314,273
Average Per Year ..................$ 9,525

$314,273 if discounted on a straight basis of an average of $9,525 per year equals $9,525 x 20.766 which amounts to $197,796. The exclusion ratio is $\frac{\$197,796}{\$314,273}$ which equals $\frac{198}{314}$ plus which equals $\frac{20}{32}$ plus which equals 61% plus. Hence approximately 61% is repayment of principal.

Thus, if we estimate the probable income tax with the appropriate number

of exemptions, but with a constant deduction for contributions, taxes and medical expenses [17] of let us say $750, we arrive at the following result:

### Table 6

| Dates | Total Annual Payment (See Table 5) | After Exclusion at 61% | Contributions, Taxes & Medical Expenses | Total Exemptions | Taxable Amount | Annual Tax (20% of First $4,000) | No. of Years | Total Paid for Period |
|---|---|---|---|---|---|---|---|---|
| 1959–63 | $14,490 | $5,652 | $750 | $3,600 | $1,302 | $260 | 5 | $1,300 |
| 1964–68 | 14,837 | 5,787 | 750 | 3,600 | 1,437 | 287 | 5 | 1,435 |
| 1969–71 | 15,534 | 6,058 | 750 | 3,600 | 1,708 | 342 | 3 | 1,026 |
| 1972 | 13,846 | 5,399 | 750 | 3,000 | 1,649 | 330 | 1 | 330 |
| 1973 | 11,982 | 4,672 | 750 | 2,400 | 1,522 | 304 | 1 | 304 |
| 1974 | 9,760 | 3,806 | 750 | 1,800 | 1,256 | 251 | 1 | 251 |
| 1975–77 | 8,475 | 3,305 | 750 | 1,200 | 1,355 | 271 | 3 | 813 |
| 1978 | 5,390 | 2,102 | 750 | 600 | 752 | 150 | 1 | 150 |
| 1979–83 | 4,973 | 1,939 | 750 | 600 | 589 | 118 | 5 | 590 |
| 1984–92 | 3,721 | 1,451 | 750 | 600 | 101 | 20 | 8 | 160 |

Total Tax .......... $6,359

Therefore, the amount of $6,359 so estimated is added to the award in order to compensate for income tax to be paid by the beneficiaries.[18]

**Motion with Respect to Cause of Action for Pain and Suffering.**

The jury rendered a verdict for $10,000 on the cause of action for physical and mental pain and suffering prior to death. In brief, the evidence in respect to this feature is that the decedent was a passenger on defendant's train which was then proceeding from Elizabethport, New Jersey, to Bayonne, New Jersey, and that at a point near the Newark Bay Drawbridge the train was derailed and went off the roadbed at a point about 490 feet west of the liftspan which was raised to permit a ship to go through it. The train fell a distance of about 8 inches to the ties and tieplates and proceeded along the ties at a speed in excess of 40 miles per hour to the precipice and then fell into the river where the water was at a depth of 35 to 40 feet. The decedent, riding in one of the two passenger coaches which went into the river, was drowned.

Under these circumstances, this court is unable to say that the decedent endured no pain and suffering. It is true that this cause of action must be sustained, if at all, on circumstantial evidence. However, circumstantial evidence cannot be disregarded. I, therefore, sustain this cause of action. The jury has assessed a value of $10,000 to this pain and suffering. I cannot state as a matter of law that this is excessive. The decedent was presumably thrown around in the car prior to the precipitation of the car into the river and to his drowning. It is not for the court to state that the damages for such pain and suffering just prior to and during drowning are less than $10,000.

17. The deduction for medical expenses is considered as a constant amount because although the medical expenses attributable to the children will decrease as they get older, those of Mrs. Gill can be expected to increase.

18. Although this amount should theoretically be discounted to its present value, the sum is a relatively small one and for the purpose of this estimate it is not considered necessary to so discount it.

It is true that certain states have held that death by drowning is instantaneous and that pain suffered after such submersion is so intimately connected with the death struggle as to form no proper distinct basis for damages. See Fike v. Peters, 1935, 175 Okl. 334, 52 P.2d 700; Beach v. City of St. Joseph, 1916, 192 Mich. 296, 158 N.W. 1045. The Fike case involved death in a swimming pool. The Beach case involved the death of a passenger in an automobile which descended into a stream. Neither case involved the preliminaries prior to the precipitation into the stream present in the case at bar. Neither case arose in New Jersey. Moreover, in Hickman v. Taylor, D.C.E.D.Pa.1947, 75 F.Supp. 528, affirmed, 3 Cir., 1948, 170 F.2d 327, certiorari denied 1949, 336 U.S. 906, 69 S. Ct. 485, 93 L.Ed. 1071 (the only case I have been able to find involving New Jersey law), the District Court for the Eastern District of Pennsylvania in giving an award under the New Jersey statutes for wrongful death and for pain and suffering prior to death awarded $1,000 for pain and suffering in a drowning case.

The motion of defendant with respect to the cause of action based upon pain and suffering is, therefore, denied.

■ By reason of the stipulation above mentioned, the fact that this cause of action is sustained brings about an automatic additional verdict for punitive damages based upon pain and suffering of 10% of the $10,000, or the sum of $1,000. This is likewise allowed and the judgment ultimately entered herein should include this item.

There was, in my opinion, sufficient and adequate evidence to warrant punitive damages on the claim for pain and suffering. The liftspan was raised and opened at the time the train came and it would appear that the employees of the railroad employed in connection with the operation of the signaling devices made no effort to stop the train from going beyond the point of danger, and that there was, therefore, reckless and wanton conduct which brought about the pain and suffering to the decedent as well as his death. Therefore, the punitive damages of $1,000, above mentioned, are sustained. The motion to preclude such damage is denied.

### The Jury's Computation.

■ Assuming factors favorable to the plaintiff as presented by his own witness, Shelly, the actuary, it appears likely that the jury concluded that the work expectancy of the decedent was 34 years and that 3% was the proper rate of discount. On this basis, the discount factor would be 21-plus. Consequently, in order to secure the discounted amount, $315,-000, which was the verdict on the death action, it would have been necessary to have an original amount for death damages of $510,000. This might very well have meant the use of a straight $15,000 a year basis ($15,000 x 21).

It, therefore, appears probable that no attention was paid to (1) the amount decedent actually would have had available, or (2) the necessary deduction of the share of that sum attributable to the husband before the contribution to the wife and children or the wife alone after the children became of age.

### Reasoning.

The basis of my reasoning may be briefly summarized as follows:

This is not a case of personal injury in which the determination of damages for past and future pain and suffering may be subject to considerable latitude.

Since, unfortunately, this is a death case, the loss in pecuniary damages is somewhat more susceptible to measurement. The problem, therefore, is, I believe, (1) that of the sufficiency of the proof, and (2) of some attempt of a reasonable computation based on established principles.

The basic problems involved in a death case such as this are:

1. What did the decedent earn?

2. What may it reasonably be expected he would probably have earned

during the balance of his life expectancy had he lived?

3. What were his monetary contributions in the recent years of his life to his wife and children and what would he reasonably be expected to contribute during the appropriate period of their respective lives had he lived?

4. What was the pecuniary value of the loss to the children of his care and guidance and advice during the respective appropriate periods of years had he lived?

5. What was the pecuniary value of the loss to the widow of his aid and assistance and services during the appropriate period of years had he lived?

In the foregoing computations I have sought to establish as far as possible the greatest amount in each category which a reasonable person could reach based on the evidence submitted in this case and all reasonable inferences therefrom. Any amount substantially in excess of the total of these computations must, therefore, be considered improperly based (whether because of passion, prejudice or mistake) and subject to the effect of this motion.

As to the question of probable future earnings, it is my considered belief, after extended deliberation, that the proof does not warrant a reasonable man coming to a greater return than I have heretofore depicted. The same is true as to the childrens' loss of decedent's care and guidance and advice and the widow's loss of decedent's aid and assistance and services during the respective appropriate periods of years had he lived.

These issues of basic value having been reasonably decided, it would definitely appear that established principles bring certain more-or-less definite conclusions under the holdings of cases by which I must be guided.

The admonitory instructions given by our own Appellate Court with respect to a review of a verdict generally and that court's more specific instructions as to the estimation of damages in death cases must be heeded. Any other procedure would, I believe, leave the determination of damages in such cases to a sea of speculation and conjecture.

In my mind, the determination of damages in any case is as important as the determination of liability. The difficulty in assessing damages is, I believe, no reason for refusal to attempt, as far as humanly possible, to do so under some rationale of measurement.

Consequently, I deemed it appropriate to make the foregoing estimates and conclusions. If I am in error, the basis of my conclusions herein appear.

### Summary.

Based upon the foregoing, I believe that the award should not substantially exceed the following:

| | | Rounded Off Figure |
|---|---|---|
| 1. Period from date of death (September 15, 1958) to date of verdict (November 12, 1959): | | |
| (a) Loss of pecuniary contributions | $9,905 | |
| (b) Loss of care, guidance and advice | 7,000 | |
| (c) Interest | 591 | |
| Total (not discounted) | $ 17,496 | $ 17,500 |
| 2. Loss of pecuniary contributions (after trial, 33 years) (as discounted) | 139,610 | 140,000 |
| 3. Childrens' loss of care, guidance and advice of father (as discounted) | 56,953 | 57,000 |

| | | | Rounded Off Figure |
| --- | --- | --- | --- |
| 4. | Cause of action, for pain and suffering (not discounted) | $10,000.... | $10,000 |
| 5. | Punitive damages thereon, pursuant to stipulation, 10% of Item No. 4 (not discounted) | 1,000.... | 1,000 |
| 6. | Allowance for income tax on the interest portion derived from the award necessary to equal the pre-discounted amounts | 6,359.... | 6,500 |
| | Total | $231,418.... | $232,000 |
| | Rounded Off To | | $235,000 |

I, therefore, conclude that the verdict is excessive and unless the plaintiff within 15 days from the date of entry of the order herein stipulates to a reduction to $235,000, the motion to set aside the verdict on the grounds of excessiveness is granted and a new trial is ordered.[19] The foregoing constitutes the Findings of Fact and Conclusions of Law on these motions.

Settle order and judgment on notice.

19. The reason for a retrial of all issues instead of a new trial confined only to the damage question is that the concession of liability by the defendant by stipulation entered into between the parties would not necessarily survive the original trial and the stipulation was a conditional one with the defendant reserving the right to dismiss both the cause of action for pain and suffering and the cause of action for punitive damages.