Eugenio JUAN, Plaintiff,

v.

**GRACE LINE, INC., Defendant.**

67 Civ. 1343.

United States District Court
S. D. New York.

May 15, 1969.

Fields, Rosen, McElligott & Auslander, New York City, for plaintiff; by James David Auslander, and Stephen Fields, New York City, of counsel.

J. Robert Morris, New York City, for defendant; by J. Roger Carroll, New York City, of counsel.

## OPINION

POLLACK, District Judge.

This is a Jones Act case tried to the Court and a jury in which a verdict of

$99,395.00 was rendered in favor of the plaintiff who was injured while employed on the defendant's ship as a carpenter's mate. The defendant moves pursuant to Rules 59, 60 and 61 of the Federal Rules of Civil Procedure to set aside the jury's verdict as excessive and for a new trial solely on the issue of damages, or, for a reduction of the verdict. The testimony was taken on one day and the case went to the jury and the verdict rendered on the next day.

The defendant contends that the plaintiff's injuries do not justify the jury's award and that defendant was deprived of a fair trial by reason of the use made by plaintiff, on trial, of the classification of the plaintiff by the Marine Hospital (a U. S. Public Health Service hospital) as "permanently not fit for duty" (sometimes referred to herein by the letters "PNFFD"). Plaintiff's counsel used this classification as the equivalent of a total and permanent disability to "go back and be a seaman anymore". "He cannot go back to sea anymore. They took away his papers." Plaintiff's counsel skillfully drove the point home with the reference to "his whole background and training has been as a seaman". "Who would hire him?" "What is he going to do now?" From this counsel argued that plaintiff was deprived for life of the only work he knew how to perform. "He's already lost three years of salary. That is $21,000. He is going to lose another 20 years [his remaining work expectancy] of salary at $7,000. That is $140,000 * * *." To this, plaintiff's counsel added 10% for expectable future salary increases in the industry, making $154,000 of salary losses to be sustained by plaintiff in the future. The jury was also asked to add to these losses an amount for past and future pain and suffering at $5 a day for the rest of plaintiff's life from the date of the accident, or $49,900. Plaintiff's counsel discounted the sum of these amounts at 4½% and came up with $178,300 as the amount which he requested from the jury.

Substantial justice and the avoidance of injustice require a new trial on the issue of damages. The size of the verdict indicates that the jury acted in the belief that plaintiff could never in his lifetime go back to sea or be a seaman, viz., the only gainful occupation he ever knew, had performed in the past, or could reasonably be expected to perform in the future. In the circumstances here and on the basis of what could properly be contended, the verdict is so excessive as to shock the conscience of the Court. To permit this verdict to stand would be a travesty on justice.

Plaintiff, a seaman for 26 years, was injured on February 5, 1966 while assisting a fellow seaman to lower a landing platform into position as the defendant's vessel was docking at Jamaica. The device holding the platform broke. His fellow seaman, an eye-witness, testified that the platform fell against plaintiff, hitting him on the hip and the head —he was not cut, there was no bleeding, "he had a few scratches on his head". A milk box stopped the platform as it fell over against the plaintiff. He was knocked unconscious temporarily. He was then walked to the ship's doctor from whom he received no treatment. He was however sent to the shore hospital where he was X-rayed and nothing was found broken. He received no treatment at the hospital and returned to the ship after two hours. During the voyage back to New York he remained off-duty and when the ship arrived in New York he went to the Marine Hospital where he was examined and placed on out-patient service and visited the hospital at intervals of weeks apart. Some time later, he was taken into this hospital as a bed patient and given traction treatment for his neck and shoulder stiffness. The doctors' notes marked plaintiff as not fit for duty during these periods.

After a further irregular course of treatment over a period of about a year, the doctor at the hospital marked him fit for duty. The plaintiff then went back to work aboard his ship and made

three voyages totalling 42 days. He was bothered by noise. He reported to the hospital and again became an out-patient, was examined from time to time, given medication, various pills, and was ultimately given a cervical collar which he wore for about a month. He continued as an out-patient on an irregular schedule for about another year. The hospital again gave plaintiff a fit for duty slip and he worked two voyages totalling 28 days. He again returned to the hospital. He was seen in the psychiatric clinic from time to time in this later period and also in other departments of the hospital—dentistry, social service, ear, nose and throat, genito-urinary, etc. —for complaints for which he was treated having no apparent relationship to the accident or his injury therefrom, e. g., hemorrhoids, etc.

In August 1968, the plaintiff visited the psychiatric clinic of the hospital and the doctor found him depressed, tense, jittery and preoccupied; he was complaining of inability to perform his duties while on the ship. The doctor's notes say that this man seemed to be permanently not fit for duty as an American seaman and that the United States Coast Guard would be notified to take his seaman's papers "for the time being". He further noted that the patient would be continued on out-patient psychotherapy and that he was to return in one month. The final note was "PNFFD (permanently not fit for duty) as of today".

On October 14, 1968 the psychiatry clinic noted that plaintiff visited there and had the same complaints, i. e., dizziness, headache, spots in front of his eyes, hypersensitivity to noise, etc. The doctor's notes are that plaintiff remains classified PNFFD and that he was to return in two months.

On November 25, 1968 the plaintiff presented the same complaints and told the doctor—the record notes—that "he feels that he may feel better if he will go to a smaller town for some months". He was given a return appointment in four months. On December 16, 1968 the

psychiatry clinic changed the appointment noting that he was to be seen in three months and again noting PNFFD. On March 25, 1969 the psychiatry clinic noted that plaintiff was still bothered by headache and noise and cannot work even on shore. Again, the notation was PNFFD. He was requested to return in three months.

Plaintiff testified that in the three years between the time of the accident and the trial he had not looked for any kind of work.

The diagnosis of the hospital of plaintiff's condition was post-concussion syndrome. His complaints, all subjective, with the single exception of a Romberg sign in 1966 which was all cleared up by 1969, consisted of headaches, dizziness, pain in the neck on turning the head and on elevating the right shoulder. A skull X-ray series showed "negative skull"; an X-ray of the cervical spine showed everything negative; and an electroencephalogram was reported by the laboratory as normal. Neurological examination at the hospital by the attending expert neuro-surgeon as well as just before the trial by the trial expert neurologist showed no abnormalities.

The treating attending neurologist at the hospital made a diagnosis of labrinthopathy—disturbance of the balance mechanism and injury to the neck and right temporal muscle. He also considered the plaintiff to be suffering from post-traumatic anxiety. The expert brought in by the plaintiff to testify at the trial gave as his opinion that plaintiff initially had sustained a cerebral concussion and that the present picture was a combination of what are called post-concussion symptoms and symptoms of anxiety and depression relating to the persistence of complaints for such a long period of time; but that these were all subjective and not objectively demonstrable—neurological examination showed no abnormalities.

The plaintiff's treating neurologist testified that plaintiff's difficulties are permanent. On this score, the plaintiff's trial expert testified that in deal-

ing with emotional or psychological reactions no one likes to use the term permanent. He said "We assume and hope that they will be remediable". However, he did not think that anyone could safely say that the plaintiff's symptoms as described by plaintiff would be interrupted in the near future; and therefore: "One has to estimate an uncertain prognosis with regard to the future". In his pretrial report to the plaintiff's counsel, no notation was made that the plaintiff's condition was permanent.

Both of plaintiff's experts enjoy very impressive qualifications.

The defendant produced an expert physician at the trial likewise with a very impressive curriculum vitae in the field of neurology and neurosurgery. He noted that all of plaintiff's complaints were subjective and unchanged since the accident; that there were no objective signs of disease or injury causally related to the accident; that the plaintiff's disability was simulated; and that he knew of no medical treatment that would benefit this plaintiff except perhaps a settlement of his law suit. He stated "personally, I don't believe he has any neurosis except he has symptoms which he is going to have, I think, until this case is settled."

For the purposes of this motion we shall disregard the testimony of the defendant's expert. The jury believed the subjective complaints of the plaintiff. However, to these complaints was added the plaintiff's contention that he was permanently deprived of his livelihood —the only one he had ever known—that of going to sea, working as a seaman. It was in this connection that the scales went grossly out of balance.

The plaintiff himself gave the testimony that the hosptial doctor made him permanently not fit for duty and he was told to turn in his seaman's papers. He testified on direct examination:

"Q.  So you can no longer go to sea anymore as a seaman, is that correct?

A.  Yes."

This was followed up by questions to the treating consultant neurologist who was asked if he was familiar with the nomenclature used at the Marine Hospital. In response, he testified that when a man is marked not fit for duty at the hospital this means that he is not in a physical condition to perform his sea duties and when he is marked permanently not fit this means "that he is—will never be in a condition—satisfactory medical condition to perform duties at sea."

The cross-examination of this expert, however, revealed that the doctor admittedly knew nothing about the administrative procedures at the hospital; that he didn't know whether there was a procedure for changing a permanent not fit for duty to a fit for duty; he said "I don't know what the regulations are." He volunteered however that in the Air Force his recollection of the regulations was that once a man had been marked not fit for duty even if he was all right and went back to obtain his license they would not give it to him; and this applied both to flight and non-flight personnel. He started to say "I assume that Coast—" but he stopped and fell back on his statement that he was not familiar with the regulations. However, the inference conveyed was plain.

The plaintiff's counsel exhorted the jury to recall that government doctors at the hospital had designated plaintiff as permanently not fit for duty; that they were dedicated doctors and had no axe to grind in this law suit. He paraphrased for the jury what they had said as "Mr. Juan, you cannot go back and be a seaman anymore, you are now permanently not fit for duty." "He cannot go back to sea anymore." The meaning and force of the PNFFD designation was left to the jury's conjecture; no witness claiming knowledge of the purpose and manner of its use by the hospital and of the Coast Guard or hospital regulations pertaining thereto testified at the trial.

46 U.S.C. § 672(i) provides that a seaman must hold a certificate of service issued pursuant to regulations promulgated by the Commandant of the United

States Coast Guard in order to obtain employment on an American merchant vessel. The Commandant is empowered to promulgate such regulations under 46 U.S.C. § 672(f); and these regulations are found at 46 C.F.R. § 12.01–1 *et seq.*

46 U.S.C. § 239(g) provides that a seaman's certificate of service may be suspended or revoked on various grounds including incompetence. The Coast Guard Commandant is empowered under 46 U.S.C. § 239(j) to promulgate regulations administering this provision; and these regulations are found at 46 C.F.R. § 137.01–1 *et seq.*

■ Incompetence is defined in 46 C.F.R. § 137.05–20(a) (3) as "the inability on the part of a person to perform required duties, whether due to professional deficiencies, physical disability, mental incapacity, or any combination of same." Incompetence is not one of the offenses for which revocation of certification is mandatory, 46 C.F.R. §§ 137.-03–3, 137.03–5.

Under 46 C.F.R. § 137.10–1, a seaman may deposit his certificate voluntarily with the Coast Guard where there is evidence of mental or physical incompetence (viz., a not fit for duty slip from a Public Health Service hospital); and this deposit is accepted on the basis of a written agreement which specifies the conditions accompanying the deposit. The Coast Guard thereby agrees to return the deposited certificate when the seaman obtains a slip from the Public Health Service hospital showing that he is considered to be fit for sea duty.

The procedure for voluntary deposit is to be sharply distinguished from the revocation of a certificate and from the surrender of a certificate to avoid a revocation hearing, 46 C.F.R. § 137.10–10. These latter procedures are employed where more serious offenses than incompetence are involved; and include a

fixed period of time (one or three years, depending on the seriousness of the offense) before application for a new certificate will be considered.

A voluntary deposit of a certificate, however, involves no such waiting period. The certificate will be returned whenever the seaman is reexamined and reevaluated and marked fit for duty by the Public Health Service hospital, 46 C.F.R. § 137.10–1(b).

American seamen are entitled to medical, surgical and dental treatment and hospitalization at Public Health Service hospitals without cost, 42 C.F.R. § 32.11. A seaman who is injured while employed on board ship is entitled to care and treatment without regard to the length of his prior service, 42 C.F.R. § 32.15. In order to receive treatment, the regulations specify that the seaman need only appear at the Public Health Service hospital with a master's certificate or continuous discharge book (these being standard documents that all American seamen carry), 42 C.F.R. § 32.14.

■ On the basis of applicable Coast Guard regulations, the fact that a member of the staff of a Public Health Service hospital has designated a seaman as "permanently" not fit for duty (a designation not explained by the record of this case) is not enough by itself under the Coast Guard regulations to bar that seaman for life from obtaining employment at sea. The hospital has no such authority.* In fact, as indicated by the moving papers hereon, the hospital sends a notice to the Marine Inspection Office of the Coast Guard when it issues a not fit for duty slip, informing the Coast Guard of its action and stating that, if later examination shows that the seaman has regained his fitness for sea duty, the Coast Guard will be so informed. This plainly ne-

---

* It is of interest to note that the Public Health Service Marine Hospital handbook delineates the categories of duty status for seamen examined by the staff. There are only two categories given, viz., fit for duty (F.F.D.), and not fit for duty (N.F.F.D.). There is no third category in the hospital handbook, such as was found in the record of the plaintiff, viz., permanently not fit for duty (P.N.F.F.D.).

gates an intent to make a lifetime designation.

■ Nor is it the function of a "permanently" not fit for duty designation to indicate that a man is physically or mentally disabled from pursuing gainful employment. The incompetence for which a deposit of a seaman's certificate is made includes any inability at the particular time of the deposit on the part of the seaman to perform his particular duties on a ship while at sea, whether due to physical disability or mental incapacity or some combination of both, 46 C.F.R. § 137.05–20(a)(3).

■ Thus the use made at trial of the PNFFD designation can only be characterized as unwarranted and completely unfounded in the applicable regulations and procedures of the Public Health Service and the Coast Guard. The Court and the jury were seriously misled as to the present and future status of the plaintiff; the error went to the very core of the jury's deliberations on the question of damages—that is, would this seaman ever during his lifetime be designated as capable, if he so desired, of going to sea again. On the evidence and statements of counsel before them, it would have been natural for the jury to assume, as they evidently did, that the plaintiff was permanently barred from the sea. In fact, Mr. Juan may apply tomorrow to get his certificate back; and he may reapply every day thereafter until he reaches the age of sixty-five. Moreover, since his complaints are completely subjective and there are no neurological signs that are objectively demonstrable to support them, there seems little for the hospital to do in considering whether to issue a FFD designation beyond receiving the plaintiff's own statement of cessation of his subjective symptoms, when and if that should occur.

■ A motion for a new trial is addressed to the sound judicial discretion of the trial court. As has been rightly said, "It is indeed an exercise of discretion full of delicacy and difficulty." In this circuit, some guidelines for the trial judge have been indicated by the Court of Appeals.

In Alexander v. Nash-Kelvinator Corporation, 2d Cir.1958, 261 F.2d 187, 191, Judge Moore wrote:

> This court is mindful of the principle so frequently reiterated that the question of the excessiveness of a jury verdict is to be determined by the trial court on a motion for a new trial. In such cases the trial court, in effect, occupies the position of a reviewing judge. He has the power to pass upon, set aside or even reduce by remittitur excessive awards.

Judge Waterman in Dellaripa v. New York, New Haven and Hartford Railroad Company, 2d Cir.1958, 257 F.2d 733, 735, well said:

> * * * the trial court has the power to set aside the jury's verdict if he believes that it is excessive * * *. The ultimate responsibility rests with the trial judge who may set a verdict aside. His power to set aside a verdict as excessive implies that he has a duty to do so when he conscientiously believes that the jury has exceeded the bounds of propriety. This duty should not be avoided by hiding behind the jury's verdict.

In a comprehensive opinion, Judge Levet has appositely observed that:

> * * * when the sum agreed on by jury is so vastly at variance with what common sense and experience dictate to be a fair allowance in the particular circumstances of the case, courts have not hesitated to exercise their discretionary power to modify the verdict in the interest of fairness to all parties.

Meehan v. Central Railroad Company of New Jersey, 181 F.Supp. 594, 608 (S.D.N.Y. 1960)

■ In this case the jury has given excessive damages. The amount is not merely greater than that which the Court itself would have awarded, but, as stated before, so excessive as to offend

the conscience and judgment of the Court—it shocks the sense of justice. The Court cannot in good conscience permit such vicarious largesse to stand on this record. The Court believes that the PNFFD designation as presented on this record gave rise to speculation and error which resulted in unfairness. These should be corrected by awarding a new trial. It is more consonant with the interests of justice that the issue of damages be retried than to attempt to fix a remittitur. The facts and circumstances in this case warrant a complete re-examination of the issue of damages by a jury.

Accordingly, a partial new trial is hereby ordered which shall be solely on the issue of damages. The issue of liability has been resolved in favor of the plaintiff and the jury's finding on this issue will not be disturbed.

So ordered.